Alex G. CLARKE, an individual, and Auto Driveaway Company, a Delaware corporation, Appellants (Defendants),

v.

Barbara Macintosh VANDERMEER, Appellee (Plaintiff).

No. 86–184.

Supreme Court of Wyoming.

July 27, 1987.

Gary R. Scott of Hirst & Applegate, Cheyenne, for appellants (defendants).

E. James Burke of Hanes & Burke, Cheyenne, for appellee (plaintiff).

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

This is a negligence case in which appellee Barbara Vandermeer was awarded a $425,000 judgment for injuries sustained in a motor vehicle accident. Appellants Alex Clarke and Auto Driveaway Company raise the following issues on appeal: (1) whether the trial court properly admitted evidence of Auto Driveaway's liability insurance policy; (2) whether the trial court erred in refusing to give several jury instructions offered by appellants; (3) whether the trial court erred in admitting certain hearsay statements into evidence; (4) whether appellee laid a sufficient foundation for the testimony of her economic witness; (5) whether the jury's verdict was supported by sufficient evidence; and (6) whether the trial court erred in denying appellants' motions for new trial.

We affirm.

## FACTS

On the night of March 22, 1981, appellee Barbara Vandermeer was hauling a load of apples from Yakima, Washington, to an eastern destination. While traveling through Wyoming on I–80, she formed a loose convoy with two other truckers she met on the highway. On the same night, appellant Alex Clarke and his friend Paul Bechtel, two students at the University of Wisconsin, were returning from spring break in California via I–80. The car they were driving was leased by Louis Allis Company, and the two students were transporting the car from California to Wisconsin for Auto Driveaway Company.

At approximately 1:30 a.m., Ms. Vandermeer came upon the Clarke vehicle on the interstate and attempted to pass it. According to Ms. Vandermeer, the Clarke vehicle drifted into her lane of traffic as she made the pass. To avoid a collision, she swerved to the left, went off the left side of the road, and pulled the truck back onto the road but was unable to control it. The truck went back across the paved surface, off the right-hand side of the road, and struck an embankment. Ms. Vandermeer apparently was not injured at that point, but steam and smoke were rising from the badly damaged truck. Fearing an explosion and unable to open the driver's side door, Ms. Vandermeer jumped from the driver's window, injuring her back as she landed on the ground.

Ms. Vandermeer's back injuries required extensive treatment, including two spinal fusion operations. In 1985, Ms. Vandermeer filed a negligence action against Alex Clarke alleging that he failed to keep a proper lookout for other traffic and failed to keep proper control of his vehicle. Ms. Vandermeer also named Auto Driveaway as a defendant, asserting that Alex Clarke was acting as its employee when the accident occurred and the company was vicariously liable for Mr. Clarke's negligence.

A jury found that Alex Clarke and Ms. Vandermeer were both negligent but concluded that Ms. Vandermeer's negligence did not cause or contribute to her injuries. The jury further determined that at the time of the accident Alex Clarke was acting as an employee of Auto Driveaway. The jury awarded Ms. Vandermeer $425,000 in damages. After entry of judgment on the verdict, appellants moved for judgment notwithstanding the verdict, new trial, and/or remittitur. They now appeal from the trial court's denial of those motions.

## EVIDENCE OF INSURANCE

Appellants first contend that the trial court committed reversible error by permitting appellee to introduce evidence of Auto Driveaway's liability insurance. In response, appellee asserts that the evidence was relevant and admissible on the contested issue of whether an employment relationship existed between Auto Driveaway and Alex Clarke.

The insurance issue arose at several points in the trial. The first reference to insurance came when appellee introduced the following deposition testimony of Gary Wolfe, an employee of Louis Allis Company, who procured the services of Auto Driveaway:

"Q. I'll hand you what's been marked as Exhibit 21 and ask you if you recognize that.

"A. Yeah. This is a—a letter after my wife had called two or three driveaway services, this was a letter she had received from Elizabeth Schneider confirming their discussion.

"Q. And what is the date of that letter?

"A. March 4, 1981.

"Q. Now, I notice on that letter that there's a paragraph that's—or part of a paragraph that is circled in blue ink; is that correct?

"A. Right.

"Q. And who did that?

"A. I did.

*   *   *   *   *   *

"Q. Why did you do that?

"A. I did it because I was concerned about their insurance coverage, but I can't specifically recall when I made the circle.

"Q. What does that part that you've circled say?

"A. We are licensed by the Interstate Commerce Commission to transport automobiles nationwide. Our rates and certificate of insurance are on file with them in Washington, D.C.

"Q. Do you recall if you circled that before or after you received notification of the incident that forms the basis of this litigation?

"A. I can't honestly tell you is—All I can say [is] that I was concerned about the insurance, the liability and so forth, and that's why I circled it because it was part of our discussion with Auto Driveaway, but to tell you the specific date, I don't know.

"Q. What do you recall about your discussion with Auto Driveaway as it relates to the language in this?

"A. Only what I told you earlier, that generally we were concerned about the reputation of the company, their experience in the industry, and as anybody would be concerned if they were going to move their—have somebody else move their car, what kind of insurance cover-

age they had and how we would be protected and how the car itself would be protected, but I can't specifically say these are the four items we talked about and this is what she told me * * *."

At appellee's request, a bench conference was held before these portions of Mr. Wolfe's deposition were read into evidence. Appellants objected to the admission of this testimony and all other references to Auto Driveaway's insurance coverage on the grounds that the evidence was highly prejudicial and contained no probative value. The court overruled the objection, concluding that the evidence was probative on the issue of the employment relationship between Mr. Clarke and Auto Driveaway.

As the trial progressed, another reference to insurance coverage was allowed into evidence over appellants' objections:

"Q. [Mr. Burke] In answering the complaint for which this action's been filed, Auto Driveaway has indicated that Mr. Clarke was acting as an independent contractor and they're not responsible for any of the actions of Mr. Clarke. That's the position they've taken in this litigation. What I'm asking you is did they ever do anything and communicate in any way to you that they took the position that they weren't in any way responsible for the actions of their drivers?

"A. [Mr. Wolfe] Quite the contrary. I wouldn't have—Anybody in their right mind wouldn't sign up with a company that was saying, hey, we're just going to put you in touch with a third party, and then what he does with your car is not our matter. They made special—They took a lot of care to indicate that they did go through a selection process and that the people that drove the cars for them were—were screened and looked at. They didn't just pick anybody that wanted to come in and take the car.

"That was—And it wasn't only my concern. It was the concern of the company. The cost was a concern of the company. The insurance coverage was a concern of the company, and they had the same things to consider that I did."

The subject of insurance came up once again during the following deposition testimony of Irwin Schneider, an agent of Auto Driveaway:

"Q. Auto Driveaway carries insurance that protects somebody else that might get injured by that driver, correct?

"A. Correct.

"Q. But you don't carry any insurance that protects the driver?

"A. Correct.

"Q. 'Our drivers are independent contractors.' I just want to know why you use that phrase.

"A. Well, the only answer I can give to that is the fact that they are not employees.

"Q. With regard to Auto Driveaway's relationship to the driver, they have an independent-contractor relationship as far as you're concerned; is that correct?

"A. Correct."

At the close of Mr. Wolfe's testimony, the court instructed the jury that it should consider the evidence of insurance only on the employment issue. A second limiting instruction was given before the jury began its deliberations. Appellants contend that the evidence was irrelevant and highly prejudicial, that the limiting instructions were insufficient to cure the resulting prejudice, and that the admission of the evidence constituted reversible error.

Rule 411, W.R.E., provides:

"Evidence that a person was or was not insured against liability is not admissible upon the issue of whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness."

In this case the evidence was not offered to prove negligence; it was offered on the issue of whether Alex Clarke was an employee of Auto Driveaway. Evidence of liability insurance may be admissible to prove an employer-employee relationship. See *Holly Sugar Corporation v. Perez*, Wyo., 508 P.2d 595 (1973). The theory behind admitting evidence of insurance to prove this relationship is that "a party is highly unlikely to purchase insurance to cover contingencies for which he is not responsible." 2 D. Louisell and C. Mueller, Federal Evidence § 194 at 583 (Rev'd 1985).

Appellants contend that this reasoning does not apply in the present case because Auto Driveaway was required by federal law to obtain the insurance policy in question. See 49 U.S.C. § 10927. We find this argument unpersuasive. The federal statute cited by appellants requires insurance sufficient to pay "each final judgment against the *carrier*." (Emphasis added.) Id. If Mr. Clarke was not an employee of the carrier, Auto Driveaway, there could be no judgment against them for his negligent acts. Therefore, we fail to see how the federal statute required Auto Driveaway to purchase an insurance policy which covered against liability for the negligence of its drivers, which it contended were not its employees. Moreover, appellants offered no *evidence* to show that the insurance policy was purchased only because it was required by federal law. This was merely an argument made to the court by appellants' counsel.

We find no error in the trial court's ruling that the evidence of insurance was probative on the employment issue. In addition, we agree with the trial court's conclusion that the probative value of the evidence outweighed the danger of unfair prejudice. Rule 403, W.R.E.

The prevailing view among the commentators is that evidence of insurance is rarely prejudicial.

"[T]he underlying soundness of the general rule forbidding disclosure of the fact of insurance has been the object of scathing criticism. * * * Its costs include extensive and unnecessary arguments, reversals, and retrials stemming from elusive questions of prejudice and good faith. This state of affairs might be tolerable if the revelations of insurance were truly fraught with prejudice. But, * * * most jurors probably presuppose the existence of liability insurance anyway, and the heart of the policy of nondisclosure is surrendered when jurors

are examined about their connection with insurance companies. Consequently, the extent to which evidence of coverage or its absence is prejudicial is unclear. Even the direction in which such prejudice might work is obscure." McCormick on Evidence § 201 at 597 (3rd ed. 1984). See also 23 Wright & Graham, *Federal Practice and Procedure:* Evidence § 5369 (1980); 2 D. Louisell and C. Mueller, Federal Evidence, supra, § 193. McCormick's treatise suggests that a limiting instruction will usually cure any possible prejudice:

"If disclosure of the fact of insurance really is prejudicial, the corrective is not a futile effort at concealment, but the usual fulfillment by the court of its function of explaining to the jury its duty to decide according to the facts and the substantive law, rather than upon sympathy, ability to pay, or concern about proliferating litigation and rising insurance premiums." McCormick, supra, at 598.

In the present case, the trial court thoroughly instructed the jury that the evidence of insurance was to be considered for the limited purpose of determining whether Mr. Clarke was an employee of Auto Driveaway. We assume the jury followed those instructions, *Barnette v. Doyle,* Wyo., 622 P.2d 1349 (1981), and we find no error under these circumstances.

### REFUSAL OF APPELLANTS' JURY INSTRUCTIONS

Appellants assert that the trial court erred in refusing three proposed jury instructions. The first two, offered by Mr. Clarke, related to Ms. Vandermeer's failure to sound her horn when passing. The third, offered by Auto Driveaway, referred to ICC regulations prohibiting the consumption of an alcoholic beverage within four hours of driving and the possession of an alcoholic beverage when driving.

■ Mr. Clarke's proposed Instruction A stated:

"You are instructed that Section 31–5–952(a) of the Wyoming Statutes provides, in pertinent part, that ' * * * the driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use such horn when upon a highway.' Under certain circumstances a driver may be held negligent for not sounding his horn prior to attempting a pass. Such circumstances may include situations in which the overtaking driver might expect the forward vehicle to meander due to wind and situations in which the forward driver is likely to be surprised by the pass. Whether such circumstances exist within the context of this case is a determination that you must make based upon all the facts and circumstances presented herein."

The trial court refused this instruction because

"[t]he material * * * added to the statute tends to go beyond the situation in this case and would not be a fair presentation of the factual evidence."

We have held that it is error to give an instruction if it is not supported by substantial evidence. *Hernandez v. Gilveli,* Wyo., 626 P.2d 74 (1981); *Brubaker v. Glenrock Lodge International Order of Odd Fellows,* Wyo., 526 P.2d 52 (1974). We find no substantial evidence in the record to show that Ms. Vandermeer expected the Clarke vehicle to meander due to wind or that Mr. Clarke was likely to be surprised by the pass. Mr. Clarke testified that he was aware that the truck was behind him, that he remained in his lane at all times, and that he would have been aware of an attempt to pass without Ms. Vandermeer sounding her horn. We find no abuse of discretion in the trial court's refusal of this instruction.

■ Mr. Clarke's proposed Instruction B provided:

"You are instructed that Section 31–5–952(a) of the Wyoming Statutes provides as follows:

" 'Every motor vehicle when operated upon a highway shall be equipped with a horn in good working order and capable of emitting sound audible under normal conditions from a distance of not less

than two hundred (200) feet, but no horn or other warning device shall emit an unreasonably loud or harsh sound or whistle. The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use the horn when upon a highway.'"

The trial court refused this instruction because it was not timely submitted:

"THE COURT: Earlier, counsel for the defendant Clarke indicated he would provide an instruction on the statute requiring motor vehicles to be equipped with horns and when they are to be used. He has now submitted to the court Instruction B, and the court has considered it and refused it at this time. The court, as I indicated earlier, had given an opportunity to counsel to prepare and submit instructions at the time of the pretrial. "And, second, they were to have them all in 20 days before trial, and together with other submitted instructions.

"And then we spent over an hour this morning going over them, and this now has been submitted at 12:57, and we are going in with the jury at 1:00 o'clock."

The court's pretrial order required the parties to submit instructions not later than 20 days prior to trial. The trial court has discretion in determining the requirements of adherence to pretrial orders. *State v. Dieringer*, Wyo., 708 P.2d 1 (1985). The court did not abuse its discretion in refusing the instruction.

■ The court also refused appellant Auto Driveaway's proposed Instruction No. 13, which stated:

"At the time of the accident, it was unlawful for an interstate truck driver to consume an intoxicating beverage, regardless of its alcoholic content, within 4 hours before operating her vehicle, or to consume an intoxicating beverage regardless of its alcoholic content while operating a vehicle, or to operate a vehicle while the driver possessed an intoxicating beverage regardless of its alcoholic content."

The source of this instruction is a federal regulation, 49 CFR § 392.5. The court re-fused this instruction because the subject was already covered in the following instruction given by the court:

"Whether or not a person involved in the occurrence was intoxicated at the time is a proper question for the jury to consider, together with other facts and circumstances in evidence in determining whether or not he was negligent. Intoxication is no excuse for failure to act as an ordinary prudent person would act. An intoxicated man is held to the same standard of care as a sober person."

Appellants assert that the court's refusal of proposed Instruction No. 13 deprived them of an opportunity to present their theory of the case. We disagree. The trial judge is afforded latitude to tailor the instructions to the facts of the case, and reversible error will not be found as long as the instructions, when viewed as a whole and in the context of the entire trial, fairly and adequately cover the issues. *Scadden v. State*, Wyo., 732 P.2d 1036 (1987).

## HEARSAY STATEMENTS

On cross-examination, appellee's counsel asked Mr. Bechtel (Mr. Clarke's friend and passenger) if he heard any comments at the accident scene to the effect that Mr. Clarke had cut off Ms. Vandermeer's truck. Appellants' counsel objected to the question on hearsay grounds. The trial court sustained the objection, but indicated that if appellee's counsel could lay a foundation for a hearsay exception, the testimony might be allowed. Appellee's counsel then attempted to lay a foundation for the excited utterance exception to the hearsay rule:

"Q. With regard to the accident scene, it was a pretty excited situation around there, wasn't it?

"A. I think any accident situation would probably be excited.

"Q. And the people that were around there were all pretty excited at the time?

"A. Not particularly.

"Q. The truck was still smoking; correct?

"A. That's true. My thoughts were more to attending to Miss Vandermeer.

"Q.   And at the time there was a possibility of explosion of the truck; is that correct?

"A.   It appeared that might happen.

"Q.   And there was an injured person; is that correct?

"A.   That's correct.

"Q.   And people were coming up on the scene; is that correct?

"A.   There were approximately three others: a police officer and the ambulance drivers.

"Q.   The people that came up on the scene, other than the police officer and the ambulance drivers, were excited about the situation, weren't they?

"A.   I can't speak for them.

　　*　　*　　*　　*　　*　　*

"Q.   [D]o you recall any comment at the accident scene relating to the cause of the accident?

"MR. POWERS: Again, Your Honor, I would object. This calls for hearsay.

"THE COURT: Well, I just need a little more time frame.

　　*　　*　　*　　*　　*　　*

"THE COURT: Yes or no, do you recall any comments about the accident?

"A.   Yes.

　　*　　*　　*　　*　　*　　*

"Q.   [Mr. Burke] And how soon after the accident was that?

"A.   In minutes?

"Q.   Yes.

"A.   I don't know if I can tell you or not.

"Q.   Do you recall what those comments were?

　　*　　*　　*　　*　　*　　*

"A.   Yes.

"Q.   And what were they?

　　*　　*　　*　　*　　*　　*

"A.   The discussion I heard was generated by the other truck drivers that saw it, and I heard discussion to the essence that a white car had cut off the semi."

■   This court has identified the following factors to be considered in determining whether a hearsay statement falls within the excited utterance exception:

1.   The nature of the startling event;
2.   The declarant's physical manifestation of excitement;
3.   The declarant's age;
4.   The lapse of time between the event and the hearsay statement; and
5.   Whether the statement was made in response to an inquiry.

*Matter of GP*, Wyo., 679 P.2d 976 (1984). In this case, appellee failed to show a manifestation of excitement, the lapse of time between the event and the hearsay statement, and whether the statement was made in response to an inquiry. Therefore, the hearsay statement was not admissible as an excited utterance. Its admission did not constitute reversible error, however, as appellants have failed to show that a "substantial right" was affected by the ruling. Rule 103, W.R.E. At the point in the trial when the inadmissible testimony was allowed, appellee had already introduced similar testimony. Accordingly, the hearsay evidence was cumulative, and its admission was harmless. 1 D. Louisell and C. Mueller, Federal Evidence § 20 at 111 (1977).

## FOUNDATION FOR ECONOMIC WITNESS TESTIMONY

■   Appellants next argue that the testimony of Ms. Vandermeer's economic witness, Dr. Jerome Sherman, should have been excluded for lack of adequate foundation. Appellants claim that Dr. Sherman's testimony amounted to speculation because he relied on Ms. Vandermeer's oral statement that she earned $388.40 per week. The $388.40 figure, however, was supported by a document which had already been admitted into evidence when Dr. Sherman testified. The trial court did not abuse its discretion by allowing Dr. Sherman to rely on the oral statement.

Appellants also claim that the court deprived them of an opportunity to voir dire Dr. Sherman on the adequacy of the information he relied upon in forming his opinions. This contention is equally without merit. When appellants requested an opportunity to voir dire Dr. Sherman, the court did not deny the request but instead

ruled that appellants' request was premature:

"Q. [By Mr. Burke]: Doctor, when we employed you to—well, what information did you need in order to perform an economic analysis?

"MR. SCOTT: Excuse me, Your Honor. May I voir dire the witness?

"THE COURT: For what purpose, counsel?

"MR. SCOTT: Do you wish me to approach the bench?

"THE COURT: I just wanted to know, are you going to attempt to ascertain whether or not he is qualified to be designated as an expert—is that your purpose?

"MR. SCOTT: No, Your Honor. The basis of the voir dire would be the adequacy of the information upon which he is basing his opinion.

"THE COURT: I think that would be cross-examination, or at least when he is giving the information or testified to what information he is using, you may bring it to our attention then."

Because appellants never renewed their request at the appropriate time, they waived any opportunity to voir dire Dr. Sherman. We find no error in the trial court's rulings regarding the admissibility of Dr. Sherman's testimony.

## SUFFICIENCY OF THE EVIDENCE

The jury found that Ms. Vandermeer was negligent but also found that her negligence did not contribute to or cause her injuries. Appellants contend that the record contains insufficient evidence to support this finding. In support of this assertion, they point to the following "undisputed" evidence:

1. Ms. Vandermeer was speeding at the time of the accident;

2. Ms. Vandermeer failed to sound her horn;

3. Ms. Vandermeer had insufficient sleep under ICC regulations; and

4. Ms. Vandermeer violated ICC regulations by drinking one or two beers in Rock Springs several hours before the accident.

Appellants' argument misses the point. This evidence merely supports the jury's finding that Ms. Vandermeer was negligent; it does not demonstrate causation.

■ Whether a breach of duty is the proximate cause of an injury is a question of fact for the jury to determine. *Caterpillar Tractor Company v. Donahue,* Wyo., 674 P.2d 1276 (1983). The record contains ample evidence to support the jury's allocation of fault. Ms. Vandermeer testified that Mr. Clarke drifted into her lane and caused her to take the evasive action which led to her injuries. Rodney Resh, a member of the loose convoy traveling with Ms. Vandermeer, testified that the Clarke vehicle was weaving when he passed it and, when he looked in his rear view mirror, "it looked like the car's headlights went over towards [Ms. Vandermeer's] truck [and] the truck moved over to the left and suddenly made a sharp right-hand turn across the highway and into the side of the mountain." On appeal we must accept this evidence as true and give the prevailing party every favorable inference which may be fairly and reasonably drawn from it. *Reese v. Dow Chemical Company,* Wyo., 728 P.2d 1118 (1986). We find it reasonable for the jury to conclude that Ms. Vandermeer's negligence did not contribute to or cause her injuries, and we reject appellants' contention that the verdict was not supported by the evidence.

## NEW TRIAL

Appellants moved for a new trial on the grounds of insufficient evidence and errors of law occurring at the trial. Rule 59(a)(1), (8), W.R.C.P. The trial court expressed some reluctance in denying appellants' motion:

"The Court was troubled, however, by the argument of defendants that 'the jury's verdict is not supported by sufficient evidence, fails to administer substantial justice to the parties, and represents a miscarriage of justice.' As expressed to counsel at the time of the oral hearing, the Court does have a general feeling of 'uneasiness,' which I believe I described more as a 'gut feeling,' that

perhaps the verdict failed to administer substantial justice to the parties. A review of the evidence as I recall it, however, convinces me that there was substantial and competent evidence from which the jury's findings, set forth above, could be made.

"I have reviewed the reasons set forth in Rule 59 for granting a new trial. None of them indicate that the Court either should or may grant a new trial simply because I have the 'gut feeling' mentioned above."

We have already determined that the verdict was supported by sufficient evidence and that no reversible errors of law occurred. Appellants urge, however, that the grounds for new trial enumerated in Rule 59 should not be held to be exclusive and that a trial judge should be allowed to grant a new trial at any time that he feels substantial justice has not been served.

It has been the law in Wyoming for many years that the enumerated grounds are the exclusive grounds upon which a new trial may be granted. *Stanton v. Chicago B. & Q.R. Company*, 25 Wyo. 138, 165 P. 993 (1917); *In re Bosick*, 48 Wyo. 46, 41 P.2d 533 (1935). In *Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246, 1254 (1977), we stated:

"[I]t is the duty of a judge, when not satisfied with a jury verdict, to set it aside and grant a new trial *for one of the reasons allowed.*" (Emphasis added.)

Appellants suggest that one of our more recent opinions, which states that a trial judge should grant a new trial whenever a jury verdict fails to administer substantial justice, reflects a departure from this rule. *Cody v. Atkins*, Wyo., 658 P.2d 59 (1983). The substantial justice standard, however, is not an individual ground upon which a new trial may be granted. It is merely a criterion to guide trial judges when deciding whether a new trial should be ordered for one of the reasons enumerated in Rule 59. The district court properly denied appellants' motion for new trial.

Affirmed.

URBIGKIT, Justice, dissenting.

This case is the reciprocal of *DeJulio v. Foster*, Wyo., 715 P.2d 182 (1986), and *Jones v. Sheridan County School District No. 2*, Wyo., 731 P.2d 29 (1987), and the corollary of *England v. Simmons*, Wyo., 728 P.2d 1137 (1986). It directly invokes issues considered by this court in *Short v. Spring Creek Ranch, Inc.*, Wyo., 731 P.2d 1195 (1987). Whether favoring plaintiff or defendant, I think that the court here is again wrong.

The trial evidence revealed that plaintiff truck driver was driving over the speed limit, had been drinking, was over hours in time for continued driving by interstate regulation, started to pass a vehicle without sounding her horn on the divided four-lane highway, then without vehicular contact moved left from the passing lane, lost control of her vehicle in the median, crossed back over the road, jack-knifed and rolled the truck-trailer unit off the outside lane and parking median, and was injured upon falling to the ground when she jumped from the truck cab window instead of climbing down.

This court affirms a judgment in her favor for $425,000 from a resulting back injury. I disagree and consequently dissent.

As a firm believer in the jury system, this writer is again unfortunately called to remind the members of this court that the danger to the jury system from society and its representative members of the legislature, arises from uncontrolled litigative excesses, unjustified in the logic of the law of tort or by the facts of the case. There is an abrogation of judicial responsibility which is uniformly resulting nationwide in attacks on the jury system. The vitality and suitability of the jury system remains unchallenged, but it is the timidity of the judiciary to control excesses that is being called into account.

"* * * [S]ome of the current vogue for complaining about overuse of the courts and of procedural excesses masks an important, value-laden debate about individual rights and the role of the judiciary in this society. In the current surge of

concern about procedural innovation, we must sort out which suggestions are put forth in an effort to limit judicial power and which are made in an effort to enhance the judicial function." Resnik, *Failing Faith: Adjudicatory Procedure in Decline*, 53 U.Chi.L.Rev. 494, 556 (1986).

" * * * [C]aught in the crossfire, legislators and the public seem increasingly determined to take steps to control not only a growing insurance crisis, but what they see as a tort system out of control, collapsing under the collective weight of endless lawsuits." Greengard, *Is the Tort System Heading for a Crash?*, 14 American Bar Association Barrister 9, 38 (1987).[1]

How did this speeding, probably sleepy, drinking truck driver get to the $425,000 judgment against the college student transporting a car for a west-coast transporter who, if anything, pulled across the division between the two driving lanes for not more than a couple of feet, as the truck driver, in excess speed without statutorily required horn-sounding compliance, started to pass, panicked, jerked to the left, drove off the paved surface into the median, lost control, crossed all lanes and piled up the truck-tractor rig off the right in the barrow pit area?

Excluding strategy and performance of trial counsel constituting the *sine qua non* of trial capability not incomparable to success in other economic and academic endeavors of our society, we can observe another syllogistic answer, insurance-insurance-insurance. This status is also not unrelated to the criminal case trial where determination by the jury is essentially directed not by proof of guilt but from atmo-

sphere of prejudice by indications of defendant's bad character.

Fundamental to our appellate system and the impact of our decisions is that who wins and who loses in the individual cases ordinarily is socially insignificant except to the participant, but the contribution of this court to the body of the law and the structure of the judicial system in our society is vitally important as a matter of precedent. We not only decide cases, but we alter the intrinsic structure of society. To be repetitive, in this case, as in many others, unless the judiciary protects the reliability and justification for the jury system, then society will substitute other processes. No-fault auto insurance is a potent example of a perceived justice-system failure. Fortunately, that bad idea for auto insurance cases is on the wane, but the theory is now reappearing in strident fact in other areas of injury recovery, such as product liability. It has been succinctly stated in *Miller v. Mayberry*, Ind., 506 N.E.2d 7 (1987), that "[j]udges should regard themselves as responsible for the rules they have erected."

"The basic function of the Supreme Court has been and ought to be the maintenance of the rule of law in our society, the rejection of arbitrariness, the prevention of agglomeration of power and the avoidance of corruption." American Law Institute, Remarks, Meeting May 13, 1986.

As far as the verdict was concerned in the standard of my views, *DeJulio v. Foster*, supra, and *Jones v. Sheridan School District No. 2*, supra, I would simply say that it was both excessive and unsupported by the evidence in either liability or amount of damages.[2] This court, if it is to justify

1. As quoted in Greengard, supra at 38, University of Wisconsin Law Professor Galanter has said:

"'As a society, we often look at all the problems associated with litigation, but we rarely make it a point to look at the benefits of it. We cannot forget that litigation is a way of holding people to some kind of accountability to public standards, a way to keep things operating smoothly and safely. If we completely lose sight of that fact, it will be all our loss.'"

2. My perception is not especially different from the observation made by the trial court in opinion letter ruling on the motion for new trial and motion notwithstanding the verdict, wherein he stated:

"The Court was troubled, however, by the argument of defendants that 'the jury's verdict is not supported by sufficient evidence, fails to administer substantial justice to the parties, and represents a miscarriage of justice.' As expressed to counsel at the time of the oral hearing, the Court does have a general feeling

its constitutional responsibilities, should support and provide reasoned leadership so that a jury verdict, good or bad, that does not provide substantial justice will not be approved in result or in jurisprudence.[3] Philosophy of rational justice aside, the specific issues addressed in appeal include: (1) evidence of insurance, especially whose insurance; (2) consumption of alcohol; (3) failure to sound horn; (4) hearsay; (5) foundation for expert witness regarding economic loss; (6) proximate cause; (7) denial of new trial.

The actual unknowns of this case, after a rather rigorous factual review of the trial evidence, is, who got sleepy or was asleep? The car driver, causing him to weave or pull out a couple of feet into the center lane, or the truck driver who had at least six feet of clear paving to the left to be crossed before she lost control at the edge of the center median, or both? The nighttime event of dangerous truck drivers who are overtime in driving and sleepy, no less than the student driving continuously headed back to school, are not an unknown phenomenon of danger on Wyoming's high-speed, low-interest rural highways.

## INSURANCE

The majority has labored mightily but without persuasive precedent or logic to justify this case's attributes of the determination of liability by the infusion of insurance. It is simply creating a fiction to accommodate a desired result to announce that a limiting instruction seals liability determination from the agency issue. Not only do judges not manage that cerebral function completely, but also neither do laymen jurors. Prejudice and emotion more immediately determine humanistic belief than do reason and rational logic. Insurance justification for a share-the-wealth cerebral conclusion as an unintended contribution to the causative decision is inevitably effectuated among the multitude of cases and the variety of discourse material. See Annot., 4 A.L.R.2d 761 (1985), Admissibility of evidence and propriety and effect of questions, statements, comments, etc., tending to show that defendant in personal injury or death action carries liability insurance, and Annot., 40 A.L.R.Fed. 541 (1978), Admissibility, after enactment of Rule 411, Federal Rules of Evidence, of evidence of liability insurance in negligence actions. The fleeting reference in *Elite Cleaners & Tailors, Inc. v. Gentry*, Wyo., 510 P.2d 784 (1973) cannot be compared to the direct infusion here.

In another context, the subject was succinctly addressed by Justice Frankfurter in *Watts v. State of Indiana*, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949): "[T]his court should not be ignorant as judges of what we know as men," or, as supplemented by the monumental critique of right to counsel by Professor Yale Kamisar, 61 Mich.L.Rev. 220, 282 (1962), as he further remarked, "I ask even less, I ask only that the court not be ignorant as judges of what they know as lawyers."

Psychologists casually assure us that insurance is an assumptive contribution in jury contemplation in most tort cases. The augmented stimuli is the ignored fact that whether or not the jury may, sub rosa, generally assume insurance, has minor de-

of 'uneasiness,' which I believe I described more as a 'gut feeling,' that perhaps the verdict failed to administer substantial justice to the parties."

The trial court's general feeling of uneasiness was justified, and therefore I would not agree with the last sentence of the paragraph and a prior sentence which defines the basis for this dissent:

"A review of the evidence as I recall it, however, convinces me that there was substantial and competent evidence from which the jury's findings, set forth above, could be made."

"The Court does not believe that errors of law occurred which prejudice the defendant's right to a fair trial, either in the admission of evidence or the refusal to give instructions."

**3.** See recommendation of mid-year meeting of the American Bar Association, Report No. 123B(2):

"There should be no ceilings on pain and suffering damages, but instead trial and appellate courts should make greater use of the power of remittitur or additur with reference to verdicts which are either so excessive or inadequate as to be clearly disproportionate to community expectations by setting aside such verdicts unless the affected parties agree to the modification."

cisional force in a mutual decision, compared to the result when that judicially approved and factually established status is created to be characterized as "You have the knife, here is the melon." Assumptive guesses compared to deliberately infused facts are not the same. The limiting instruction afforded in this case only magnifies the causative factoring of the collective mind and the combined attitude of the jury. To say otherwise is to ignore reality in favor of fancy.

The limited benefit, if not the augmenting factor of the limiting instruction,[4] has frequently been considered in the emotionally effectuating circumstance criteria by the United States Supreme Court. Justice Brennan, in *Bruton v. United States*, 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476 (1968) stated:

> " 'The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants * * *.' " Quoting from *Delli Paoli v. United States*, 352 U.S. 232, 247, 77 S.Ct. 294, 302, 1 L.Ed.2d 278 (1957).

Justice Jackson, in his concurring opinion in *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) stated:

> " * * * The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction."

As further indicated in Bruton, "[a] jury cannot 'segregate evidence into separate intellectual boxes * * *.' " *Bruton v. United States*, supra, 391 U.S. at 131, 88 S.Ct. at 1625.

Judge Learned Hand, in considering the limiting instruction observed in *Nash v. United States*, 54 F.2d 1006, 1007 (2nd Cir.1932), wrote

" * * * In effect, however, the rule [limiting instruction] probably furthers, rather than impedes, the search for truth, and this perhaps excuses the device which satisfies form while it violates substance; that is, the recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else."

It is recognized that sometimes the limiting instruction is a choice of necessity in the orderly processing of trial evidence *Bruton v. United States*, supra; 8 Wigmore, Evidence § 2272 (Chadbourn rev. 1981), but the availability and use of the limiting instruction when the evidentiary benefit is de minimis compared to the prejudice, cannot be justified as a necessity. The subject is considered in a current United States Supreme Court case by its newest member, Justice Scalia:

> "The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." *Richardson v. Marsh*, —— U.S. ——, ——, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987).

From this court, compare *Schmunk v. State*, Wyo., 714 P.2d 724 (1986) with *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, Wyo., 664 P.2d 27 (1983). Mr. Justice Holmes said many years ago in *Irwin v. Gavit*, 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925):

> " * * * Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law."

I have no difficulty in discerning that the introduction of insurance in this case afforded nothing of decisional value except the prejudicial result of plaintiff recovery without validating evidentiary support. The actual and unquestioned relationship

---

**4.** "It has been suggested that the limiting instruction actually compounds the jury's difficulty in disregarding the inadmissible hearsay. See Broeder, The University of Chicago Jury Project, 38 Neb.L.Rev. 744, 753–755 (1959)." *Bruton v. United States*, 391 U.S. 123, 130, n. 4, 88 S.Ct. 1620, 1624–25, n. 4, 20 L.Ed.2d 476 (1968).

of the parties was not attenuated by the circumstance that a federal agency required permissive drivers to be additional insureds. No desirable accommodation is demonstrated meriting prejudicial introduction of the insurance issue. *Ben M. Hogan Co., Inc. v. Nichols*, 254 Ark. 771, 496 S.W.2d 404 (1973).

## SOUNDING HORN

I am severely perplexed by the conclusion of this court on the statutory requirement to sound the horn, in the face of the very recent decision in *England v. Simmons*, supra, 728 P.2d 1137. Confusion becomes anarchy if one additionally infuses into this discussion the per-se and evidence-of-negligence dichotomy shrilly disputed in *Short v. Spring Creek Ranch, Inc.*, supra, 731 P.2d 1195.

I have read and re-read the record without achieving any idea why plaintiff drove off the road, except that she was nearly asleep or had just been asleep, but failure to sound the horn as warning, if the vehicle in front did in fact move into her passing lane, demonstrates a violation of a national driving standard as enfolded into the Wyoming traffic code. Before plaintiff drove off the road, considering the distance and space available for continued and unhampered travel, she could have at least sounded her horn. Denial of a theory-of-the-case instruction for jury resolution in inexplicable. The statutory obligation to equip a vehicle with a horn and to use it exists for a purpose. I find this court again acting as a legislature in non-application of statutes as was philosophically considered in *Duffy v. State*, Wyo., 730 P.2d 754, 761 (1986), Urbigkit, J., dissenting. The statutes disregarded in this case are:

Section 31–5–203, W.S.1977:

"(a) The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions and special rules hereinafter stated:

"(i) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle;

"(ii) Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle."

Section 31–5–952(a), W.S.1977:

"Every motor vehicle when operated upon a highway shall be equipped with a horn in good working order and capable of emitting sound audible under normal conditions from a distance of not less than two hundred (200) feet, but no horn or other warning device shall emit an unreasonably loud or harsh sound or a whistle. The driver of a motor vehicle shall when reasonably necessary to insure safe operation give audible warning with his horn but shall not otherwise use the horn when upon a highway."

We now confuse the theory-of-the-case anarchy by the denial of that instruction. No more justified is the denial of any jury instruction on consumption of alcohol involving a couple of beers in Rock Springs, some 240 miles west of the accident scene.

I do not find judicial discretion, *Martin v. State*, Wyo., 720 P.2d 894 (1986), to be accommodated by failure to instruct in regard to a theory of the case, contending violation of a state statute. I am not satisfied by the denial in this case premised on a pretrial process. In the trial proceedings and evidentiary presentation, failure to sound the horn and alcohol consumption were pervasive and singular issues.

In this regard, the court's opinion lacks rationality. Under even a per-se standard for violation of a statute, it is the duty of the jury to apply the standard afforded by a statutory requirement to the conduct for a proximate-cause determination. It is said in federal regulation and state statute not to drink and drive. Proximate cause in later inattention may rationally be discerned as a jury fact. The jury and not the judge should have used the statutory standards for conduct to determine whether proximate cause existed. It is incompre-

hensible that the theory-of-the-case instruction involving statutory violations should not have been given under the facts of this truck-wreck case.

Actually, the court failed to instruct on either the state statute or a federal regulation. This court's justification of those omissions is not only factually unpersuasive but rationally illogical. Clarke's proposed Instruction A not only fairly addressed the theory of the case but also succinctly included the essence of the statute, and when that fair instruction was denied, then appellant was clearly entitled to the stated statute instruction as an alternative. Trial proceedings are not strategy gamesmanship between counsel and the court, but conversely should be the desire for justice in the search for truth. Processes exist only to afford an organizational basis to reach that defined goal.

Furthermore, this court again is wrong to reject the instruction as unsupported by substantial evidence. This is a "lost control on passing without sounding horn" case. What more need be said about the applicability of the state statute relating to the sounding of the horn on passing a vehicle? It is absurd enough to question whether the court knows why horns are provided on motor vehicles. Conceptually it is supposed to be to warn of presence and to avoid an accidental collision.

Responding to the conclusion that specific statutory instruction need not be given after the substantive instruction was rejected, this court incorrectly analyzes the record and trial events. The pretrial order provided:

" * * * Not later than *20* days prior to trial, counsel will have served upon the Court and other counsel, a complete proposed set of instructions, and will, within 10 days following service of instructions filed by other counsel, serve on the Court and counsel their written objections thereto, if any. *Counsel may propose additional instructions at the time of trial, if necessitated by the evidence, and if the same could not have been reasonably anticipated.*" (Emphasis added).

Proposed Instruction A was duly filed and clearly justified by the discussion of this court in *Campbell v. W.S. Hatch Co.*, Wyo., 622 P.2d 944 (1981) as supporting authority in instruction presentation, and if the court then chose to ignore *Hatch* and its reasoning, then the pervasive alternative of the pretrial order would clearly apply, permitting an instruction that simply restated the statute. Instruction A had been supplied and filed with the court on February 25, 1986. In denial of proposed Instruction B as a substitute for A, the court both ignored the pretrial order and rejected any instruction on perhaps the most important aspect of appellant's theory of the case. "If Ms. Vandermeer had sounded her horn rather than driving off the road, this accident where she 'wrapped up her truck' would not have happened." It is not my province to determine what the jury under the circumstances would have done, but only that they should have accurately been furnished the issues presented by the law of the road and the facts of the accident. It is not accurate to state that appellant failed to adhere to the pretrial order on a requested horn-sounding instruction. Furthermore, I would submit that before or as one dodges to miss a passed vehicle which appears to encroach, *minimum* driving intelligence requires a horn-sounding warning, particularly so where, as here, the statute does exist. Appellant was entitled to an instruction as requested. In the nature of the science of physics, even if Clarke encroached a couple of feet, the Vandermeer truck did not cross over the remaining space and leave the paved road surface in anything like a few feet. If, in accord with the evidence, the passing net speed differential of about 10 miles per hour or 8.8 feet per second, the truck then traveling something in excess of 90 feet per second, would have traveled several seconds and a couple of hundred feet in the swerve and lost control movement to leave the road as it did.

I am no more satisfied with the attendant rejection of the 49 C.F.R. § 392.5 instruction prohibiting consumption of alcohol beverages by a truck driver. The issue

presented was not necessarily only "intoxication," addressed by the given instruction, but also the attendant factors for the driver of drowsiness and slowed reaction, intrinsically considered in federal regulation adoption for application to interstate truck drivers. Any person who is speeding and over hours in driving time is empirically more at risk if he or she has previously consumed alcohol. The jury was entitled to know about the violation of law with which appellee's driving was encumbered. It is axiomatic in a multitude of Wyoming cases that a party is entitled to an instruction involving theory of the case. *Scheikofsky v. State,* Wyo., 636 P.2d 1107 (1981); *Taylor v. Stockwell,* 22 Wyo. 492, 145 P. 743, reh. denied 147 P. 328 (1915).

## HEARSAY

I would concur with the majority that the hearsay was improperly introduced into evidence. Unfortunately, the strands, like the weaving of a fiber basket, are neither insignificant nor harmless in result. Since the case involved the direct dispute as to whether defendant even crossed the highway dividing line as the motivating factor of plaintiff's driving off the highway, the introduction of inadmissible hearsay to prop up plaintiff's testimony was certainly not harmless. In reality, we do not even know whether the hearsay was first-, second- or third-party, or if essentially motivated by clannish desire to protect one's own as a truck driver. The serious detriment of trial by nonchallengeable hearsay evidence is most clearly presented. Under the circumstances of the minimal evidence here of defendant's negligence, it could hardly be considered harmless. The effort of appellant to exclude, and the continued pretrial to trial campaign of appellee to introduce, witnessed the reasoned decisions

of the litigants that introduction would not be "harmless."

Furthermore, neither party actually briefed the issue of harmless error as to the admissibility of the contested hearsay statement. In application this was not "an error which is trivial or formal, or merely academic and not prejudicial to the substantial rights of the party signing it and in no way affected the final outcome of the case." Black's Law Dictionary, 646 (5th ed. 1979). Conversely, as a matter of pure logic and fact, if this hearsay were but "harmless" then even more reason for the horn-sounding instruction existed. If plaintiff knew Clarke was a "weaver," then even more reason for a horn warning could be found by the jury.

## SUFFICIENCY OF THE EVIDENCE

Obvious beyond question, Vandermeer was negligent. The question is whether proximate cause absolves her from responsibility for her own injuries. Physically, whatever happened to her, she did to herself. This is not a country road, but an interstate highway with two driving lanes of approximately 13 feet each.[5] Traveling substantially in excess of the speed limit, driving long hours and at night, plaintiff was unable to successfully pass one passenger car which she said "moved into her lane two feet." In affirming, this court now strikes beyond incredibility to incongruity.

Do I discern a rule that the faster you go, the more rights on the road you have? In applying the rule stated in the very first case decided by the Wyoming Supreme Court in *Western Union Telegraph Company v. Monseau,* 1 Wyo. 17, 19 (1870):

"If there is reason to suppose that the jury have mistaken or misunderstood the

5. The highway patrol described configuration of the highway at the point of accident from center to outside barrow pit as berm from dirt median area 21 inches, outside of lane driving surface 18 inches, passing lane 13 feet, driving lane 12 feet 6 inches, emergency parking lane 7 feet, and finally outside berm to barrow pit 18 inches. There was no evidence of vehicle braking at the scene. The first scuff marks made by the truck were where it had come back onto the paving when crossing the inside berm and then traveling to where it jack-knifed off the road a distance of 224 feet. The truck was eight feet in width. Appellee told the investigating officer that she was going about 64 miles per hour or 9 miles above the speed limit for the area. At the legal speed limit of 55 miles per hour, she would never have passed the slower traveling automobile which was traveling at a rate considerably closer to the maximum speed limit.

evidence, or that they have been carried away by fashion or prejudice, and thereby have done evident injustice to either party, it is the duty of the court to set aside their verdict and grant a new trial,"

I find cause for reversal and would remand for a new trial.