Raymond Estel HORTON, Jr.,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 87–185.

Supreme Court of Wyoming.

Nov. 15, 1988.

Wyoming Public Defender Program, Leonard D. Munker, State Public Defender, Julie D. Naylor, Appellate Counsel, Cheyenne, Gerald M. Gallivan, Wyoming Public Defender Aid Program, Thomas B. Quinn, Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Sylvia Lee Hackl, Sr. Asst. Atty. Gen., Michael W. Schafer, Student Intern, Cheyenne, for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J.,* Retired.

THOMAS, Justice.

The only question presented by this appeal is whether the admission of testimony from a physician treating a shooting victim in a hospital emergency room that included statements of the victim concerning the identity of his assailant constitutes reversible error. The hearsay statement was offered by the prosecuting attorney under Rule 803(4), W.R.E., relating to statements made for purposes of medical diagnosis or treatment. The trial court admitted the testimony, which did not specifically identify the defendant, invoking res gestae as a basis for admission. We hold that the admission of this testimony did not constitute an abuse of the discretion afforded a trial court with respect to rulings on the evidence. The judgment and sentence is affirmed.

The appellant, Raymond Horton, sets forth the following issues:

"I. Whether certain testimony by Dr. Brungardt was hearsay not reasonably pertinent to the diagnosis or treatment.

* Retired June 30, 1988.

"A. Whether Dr. Brungardt's testimony in violation of Wyoming Rules of Evidence 803(4) was harmless error.

"II. Whether Dr. Brungardt's statements as to fault were admissible under the theory of res gestae as an exception to the hearsay rule."

The State of Wyoming, as appellee, offers this version of the issues:

"I. Whether the trial court erred in admitting into evidence Dr. Brungardt's testimony regarding the victim's statements.

"II. Whether any error in admitting the victim's out-of-court statements to the doctor was harmless."

Horton was convicted of the attempted first-degree murder of Mark Piper in violation of §§ 6-2-101(a) and 6-1-301, W.S. 1977 (1983 Repl.).[1] The material facts that resulted in Horton's conviction are set forth in the testimony of the victim. The victim, Horton, and a third person went to Horton's house after driving around and consuming a six pack of beer. When they arrived, the third person and Horton remained in the car while the victim went inside the house and sat down to watch television with a fourth man. Horton then came into the house, pointed a .22 caliber pistol at the victim, and said, "Come on, punk. We are going for a ride out in the country. We are going to talk." The man who had been in the house objected to what Horton was doing and pointed out that someone could get hurt. Horton then called the victim a foul name, pointed the pistol at the victim's head, cocked the trigger, and then said, "I am serious." The victim stood up and began to walk toward the door with Horton following him and pointing the pistol at the back of the victim's head. As he opened the front door,

the victim decided he would attempt to escape by running out the door and around the side of the house. This effort was not successful and, as he was running toward the road, he was shot in the back.

After he was shot, the victim tried to shout for help, but he could not due to the fact that his mouth was congested with blood. He did look back toward the house and saw Horton pointing the gun at him. Horton then placed the gun in his pants and walked up to the victim, stating that he should finish the job right there. A neighbor passed by at about that time. She testified that she saw a man lying on the ground and that Horton approached him while calling to someone in the house to assist in carrying the man into the house. She asked Horton what had happened, and Horton replied that he had lit a fire-cracker and "the guy freaked out." She did see a man come out of the house to help Horton carry the victim back into the house. With respect to these latter events, the victim also testified that Horton called to the man who had originally been in the house to help him drag the victim inside. That man came outside, and the two of them took the victim inside. The victim then told Horton to either take him to the hospital or go ahead and kill him. The other man decided that it was necessary to take the victim to the hospital and, after some discussion, Horton agreed. On the way to the hospital, Horton insisted that the victim promise not to tell who had shot him. The victim, still in fear for his life, agreed that he would not say that Horton had shot him.

The only other witness for the prosecution was the physician who saw the victim in the emergency room at the hospital. She was called as the first witness for the State, and her testimony incorporated the

---

1. Section 6-2-101(a), W.S.1977 (1983 Repl.), provides:

"Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest or kidnapping, or by administering poison or causing the same to be done, kills any human being is guilty of murder in the first degree."

Section 6-1-301, W.S.1977 (1983 Repl.), provides, in pertinent part:

"(a) A person is guilty of an attempt to commit a crime if:

"(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A 'substantial step' is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime; * * *."

following facts. Horton and another man brought the victim in on the day of the shooting. Hospital records note the time as 5:35 P.M. The victim was coughing up blood, and an examination disclosed an obvious bullet wound with entry in the upper right portion of his back. X-rays were taken, and they disclosed that the bullet had lodged in the victim's left lung with some fragments located around the spinal column. After stabilizing the victim's breathing, the doctor conducted a more thorough examination and discovered that the victim was paralyzed from the waist down. In discussing the victim's condition, the doctor said, among other things:

"He did become rather shocky in the emergency room.

\* \* \* \* \* \*

"[H]e was beginning to get unstable in the emergency room. The pressure was dropping. He was becoming quite pale and sweaty, \* \* \*.

\* \* \* \* \* \*

"He was oriented but scared and panicky, \* \* \*."

Following the description of the examination of the victim, the X-rays that disclosed the location of the bullet, and the condition of the victim, the prosecuting attorney asked the doctor if, during the course of her treatment, she had asked the victim what happened to him. The doctor replied that she had, and defense counsel then interposed an objection which was overruled. The doctor then testified:

"Yes, I did. Like I said, after I made sure that he was breathing on his own and his heart was beating and he was in no immediate danger of dying right there, I asked him what had happened, and he said that he had been shot in the back, and I said who did it, and he said he was standing out in front—"

At this juncture, defense counsel again objected, arguing that the rest of the statement would not be pertinent with respect to medical treatment. This objection also was overruled, and the trial court stated:

"THE COURT: It is part of res gestae, though, isn't it?

"[Defense Counsel]: I think the only exception would be as to medical tests, and there is—

"THE COURT: How about history? Overruled. Go ahead, doctor, you may answer."

The treating physician then testified:

"A: He told me that he had been standing out in front, outdoors in the yard, talking to a man named Mike Hernandez, and that he turned around and walked back into the house, and he was shot in the back. And I asked him who did it, just because that is part of the history, and he didn't answer right away, and then finally after—there were two men that brought him in and were hovering over him all the time, slapping him, telling him, 'Don't die! Don't die on me!' And they were getting in my way. When they disappeared, after they left—

\* \* \* \* \* \*

"He told me he turned to walk back in the house, and a friend of Mike's shot him in the back, and that's all I remember him telling me. I couldn't get any more details, and, frankly, I wasn't looking for more details. I wanted to know what had happened, where it had happened, because being outdoors or indoors makes a difference. If it had been outdoors which was in December, which was cold, then I had other things to worry about, like his cold exposure, how long he was left out there, those kind of things, and, like I said, the two men that had brought him in, and they brought him in by private vehicle, and they dragged him down the hallway, which that certainly is not what we wanted to have done. We would have preferred him to be put on a cart at the door of the emergency room. They dragged him down the hallway and put him on the cart."

The essential issue is found in Horton's claim that prejudicial error occurred in the admission of the treating physician's testimony concerning the victim's statement relating to who had shot him. We afford deference to the discretion of the trial court with respect to rulings on the admis-

sion of evidence, and we will not reverse because of a ruling admitting evidence unless there was an abuse of discretion. *Noetzelmann v. State*, 721 P.2d 579 (Wyo. 1986); *Carey v. State*, 715 P.2d 244 (Wyo. 1986), cert. denied 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). See 1 D. Louisell & C. Mueller, Federal Evidence § 29 at 196–200 (1977). If there is a legitimate basis for the decision of the trial court, and it did not act in an unreasonable way, we will sustain its ruling. *Noetzelmann v. State*, supra; *Bishop v. State*, 687 P.2d 242 (Wyo.1984), cert. denied 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985).

The conclusion to be drawn from the record is that the trial court found the hearsay admissible as a statement reasonably pertinent to medical diagnosis or treatment and also as part of the res gestae. In its brief and argument, the State contends that admissibility is also sustained as an excited utterance. See Rule 803(2), W.R.E. Excited utterance is the correct premise for admitting this evidence and, at the time it was received at the trial, the court's ruling was correct.

While the concepts that traditionally were labeled as "res gestae" are still present in the law of evidence, the phrase itself no longer is present under the Wyoming Rules of Evidence. Given the adoption of the Wyoming Rules of Evidence, it probably is more helpful for courts and counsel to address evidentiary issues in the language of those rules. The State of Wyoming correctly perceives that the concept which would fit the trial judge's label of "res gestae" is that of an excited utterance. Rule 803, W.R.E., expresses that concept in this way:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

"(2) *Excited utterance.*—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition; \* \* \*."

Professor Wigmore has commented on the res gestae exception to the hearsay rule in this way:

"The exposition of this exception might well be approached with the feeling akin to despair. There has been such a confounding of ideas, and such a profuse and indiscriminate use of the shibboleth res gestae, that it is difficult to disentangle the real basis of principle involved. On the one hand, to repeat without comment the often meaningless and unhelpful language of the courts is to shirk the duty of the expositor of the law as it is. On the other hand, to discriminate between the principles genuinely involved is to risk the reproach of representing as law that which the courts do not concede. The expositor of the law can only endeavor to avoid impalement upon either horn of the dilemma; relying, in any event, upon the plain language of those courts which have sought to recognize the exception in its real character, and calling to mind the frank concession long ago made by Chief Justice Beasley: 'I think I may safely say that there are few problems in the law of evidence more unsolved than what things are to be embraced in those occurrences that were designated in the law as the res gestae.'" (Footnote omitted.) VI J. Wigmore, Evidence § 1745 at 191–192 (Chadborne rev. 1976).

According to Louisell & Mueller, under the Federal Rules of Evidence, from which the Wyoming Rules of Evidence are drawn, res gestae has been subsumed within the exceptions to the hearsay rule found in Rule 803, such as excited utterances, statements describing mental or physical conditions, and statements for purposes of medical diagnosis or treatment. 4 D. Louisell & C. Mueller, Federal Evidence § 438 at 485 n. 68 (1980). As we have indicated above, we are in accord with the courts that have declared that the term "res gestae" should be eliminated from the language of the law of evidence because it is no longer useful and tends only to confuse the reasoning with respect to why a given hearsay statement should be admissible. See *Hilyer v. Howat Concrete Company, Inc.*, 188 U.S.

App.D.C. 180, 578 F.2d 422, 48 A.L.R.Fed. 442 (1978); *Chestnut v. Ford Motor Co.,* 445 F.2d 967 (4th Cir.1971); *Nuttall v. Reading Company,* 235 F.2d 546 (3rd Cir. 1956); *United States v. Matot,* 146 F.2d 197 (2d Cir.1944).

In this instance, the trial court invoked the excited utterance exception to the hearsay rule when it referred to res gestae. In three cases, this court has considered that particular exception. *Clarke v. Vandermeer,* 740 P.2d 921 (Wyo.1987); *Kelly v. State,* 694 P.2d 126 (Wyo.1985); *Matter of GP,* 679 P.2d 976 (Wyo.1984). See also *Chambers v. State,* 726 P.2d 1269 (Wyo.1986), Thomas, C.J., dissenting. In *Clarke v. Vandermeer,* supra, we referred to five factors that were discussed in *Matter of GP,* supra, and applied them in determining whether evidence was properly admitted under the excited utterance exception. The factors are:

"1. The nature of the startling event;
"2. The declarant's physical manifestation of excitement;
"3. The declarant's age;
"4. The lapse of time between the event and the hearsay statement; and
"5. Whether the statement was made in response to an inquiry." *Clarke v. Vandermeer,* 740 P.2d at 927.

In this instance, factors one, two, and four would support the admissibility of the hearsay declaration while factor three appears neutral. Only factor five presents a problem with respect to admissibility.

These factors are useful in evaluating the admissibility of proffered evidence, but the ultimate inquiry must be whether the "declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." *Matter of GP,* 679 P.2d at 1003 (quoting *United States v. Iron Shell,* 633 F.2d 77, 55 A.L.R. Fed. 664 (8th Cir.1980); cert. denied 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)); *Kelly v. State,* supra. The rule itself requires that the statement relate to a startling event or condition and be made while "the declarant was under the stress of excitement caused by the event or condi-

tion * * *." Other courts have had little difficulty applying this rule with respect to trauma victims. E.g., *Haggins v. Warden, Fort Pillow State Farm,* 715 F.2d 1050 (6th Cir.1983), cert. denied 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984); *People v. Franklin,* 683 P.2d 775 (Colo. 1984); *Rhiner v. City of Clive,* 373 N.W.2d 466 (Iowa 1985); *State v. Roy,* 214 Neb. 204, 333 N.W.2d 398 (1983).

In this instance, there is no question about the presence of the startling event as required by Rule 803(2), W.R.E. At the time the trial court made the ruling, the only information it had was that given by the emergency room physician which described the declarant as having become "rather shocky," "unstable," "quite pale and sweaty," and "scared and panicky." There was then no information before the court relating to the victim's agreement to protect Horton, and nothing suggests that the victim was any different from other victims of trauma. The record supported a conclusion, properly reached within the scope of the discretion of the trial court, that the victim was "under the stress of excitement caused by the event * * *." This case fits neatly within the summary offered in 4 D. Louisell & C. Mueller, Federal Evidence § 439 at 495–498 (1980):

"* * * [T]wo categories of cases which time and again generate statements received as excited utterances are worth special note. They are the cases of violent criminal assault, where statements by the victim implicating the accused are usually received, and cases of accidents resulting in physical injury, where statements by the injured party describing the occurrence are likewise usually received." (Footnotes omitted.)

Because the statements to the emergency room physician were properly admitted as an excited utterance, we hold there was no error as claimed by Horton.

The admissibility of this testimony is justified under the excited utterance exception to the hearsay rule, and we could refrain from any discussion of the admissibility of the testimony as a statement made for purposes of medical diagnosis or treat-

ment. In that respect, Rule 803, W.R.E., provides, in pertinent part:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

"(4) *Statements for purposes of medical diagnosis or treatment.*—Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment;
\* \* \* ."

In prior cases, we have afforded ample discretion to the trial court to determine whether a proper foundation has been presented to permit the admission of hearsay under this exception. See *Jahnke v. State,* 682 P.2d 991 (Wyo.1984); *Goldade v. State,* 674 P.2d 721 (Wyo.1983), cert. denied 467 U.S. 1253, 104 S.Ct. 3539, 82 L.Ed.2d 844 (1984). Our decisions are in accord with the suggestion stated in 4 D. Louisell & C. Mueller, Federal Evidence § 444 at 598 (1980), that the pertinency standard should be generously construed. *Goldade v. State,* supra. Even under a rule of broad discretion, however, there are hearsay statements which cannot be admitted under this exception:

"But the pertinency standard does impose a true limit. Embellishments attributing fault are not reasonably pertinent. The fact the declarant believes that the injury only happened because defendant ran a red light, or omitted certain safety precautions, or imposed unreasonable demands in a working situation are immaterial, so far as diagnosis or treatment is concerned, and fall outside the instant exception. So do statements suggesting that an injury was deliberately inflicted." (Footnotes omitted.) 4 D. Louisell & C. Mueller, Federal Evidence § 444 at 603–605.

This general statement was accepted in *Goldade v. State,* supra, but we observed that there is an exception if an appropriate foundation is presented which demon-strates that identity is pertinent to the diagnosis or treatment. See *United States v. Denoyer,* 811 F.2d 436 (8th Cir.1987). Compare *United States v. Iron Shell,* supra. For another general proposition, see 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 804(4) at 143–151 (1987). In this instance, it is difficult to discern any foundation that would permit the trial court to conclude that identity was pertinent to the diagnosis or treatment. The testimony, however, did not result in an identification of Horton by the hearsay declarant. Consequently, we cannot ascribe any error to the admissibility of this testimony on the premise that it should not have been admitted because the statement ascribing fault was not "reasonably pertinent to diagnosis or treatment."

We suggest to the trial courts that, in weighing the admissibility of the testimony proffered under the exception for statements made for purposes of medical diagnosis or treatment, it is important to have foundation testimony with respect to the pertinency of the information that is as complete as possible. In this regard, another concept suggested in 4 D. Louisell & C. Mueller, Federal Evidence, § 444 at 601 is apt:

"The pertinency standard should be construed broadly enough to reach facts which would naturally be recited in a good-faith effort to provide needed information. If a patient, for example, tells a treating physician that he first felt pain while pulling some heavy pipes at work, the fact that diagnosis and treatment would have been the same if the patient had simply told the doctor that he stooped down and pulled on a heavy object should make no difference. Nothing is gained in terms of protecting the jury from untrustworthy evidence by applying Rule 803(4) so stringently as to require exclusion of details naturally included in an honest to-the-point effort to describe what happened."

The hearsay declaration in this instance, if it had to be scrutinized exclusively under Rule 803(4), W.R.E., might well fall within this proposition. Certainly, no justification

can be found for a conclusion that it was erroneous. to admit it under the excited utterance exception because it so clearly was not admissible as a statement made for purposes of medical diagnosis or treatment.

The ruling on the admission of this evidence by the trial court was not erroneous, and the judgment and sentence is affirmed.