466 So.2d 764 (1985)
Linda OWENS
v.
LOUISIANA STATE RACING COMMISSION, et al.
No. CA-2584.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1985.
Writ Denied May 13, 1985.
*765 Paul A. Bonin, Carla A. Failla, Levenson & Bonin, New Orleans, for appellant.
William J. Guste, Jr., Atty. Gen., Robert A. Barnett, Asst. Atty. Gen., John E. Jackson, Jr., Asst. Atty. Gen., and Atty. for the La. State Racing Commission, New Orleans, for appellee.
Before REDMANN, C.J., and LOBRANO and ARMSTRONG, JJ.
LOBRANO, Judge.
Linda Owens (Owens) was suspended for thirty days after the Louisiana State Racing Commission (Commission) upheld a steward's ruling which determined that the prohibited medication, procaine, was present in a urine sample taken from a horse named "Doonsey Luck" which she trained. The lower court affirmed the Commission's ruling, and Owens perfects this appeal.
This appeal raises the issue of the constitutionality of the "absolute insurer" rule and the correctness of the Commission's findings.
After winning a race at Jefferson Downs on April 27, 1983, a urine sample was taken from the horse "Doonsey Luck". In accordance with LAC 11-6:53.37.1 [1] the urine was divided into the test sample and the referee sample. The test sample was analyzed by the State chemist who found it to be positive for the presence of procaine, a prohibited medication. Owens requested that the referee sample be sent to an approved alternate laboratory for further testing. This sample was sent to Industrial Laboratories Company of Denver Colorado. The text of its findings are as follows:
"Sample numbered J-2252 was received packaged with three other samples on May 17, 1983 properly sealed. The samples were delivered to the laboratory during the spring blizzard while a power outage was in effect and the phones were not working properly. No one from the racing chemistry staff was in *766 the laboratory and the sample container was not placed in the freezer by the employee present. The power outage continued through most of the following day and analysis could not be performed so the sample was placed in the freezer until May 22, 1983. Analysis on May 22 by thin layer chromatography and by Gas Chromatography-Mass Spectrometry showed no Procaine to be present.
Ms. Pat Pizzo sent a portion of her sample numbered J-2252. Analysis by Gas Chromatography-Mass Spectrometry showed Procaine to be present in this portion.
The pH of the sample we received was 7.6 (slightly on the alkaline side). Procaine is known to undergo decomposition in alkaline solution and this may account for our failure to confirm the presence of Procaine in our portion of sample J2252."
The pertinent text of the Steward's report in support of their ruling in this case is as follows:
"6/13/83 RECEIVED THE REPORT FROM THE OZOG LAB THAT THE SPLIT FROM THE HORSE "DOONSEY LUCK" PROVED NEGATIVE FOR PROCAINE DUE TO UNUSUAL CIRCUMSTANCES. SET UP A HEARING FOR TRAINER LINDA OWENS FOR JUNE 15, 1983 AT 5:00 P.M.
NOTE: FOUR SPLIT SAMPLES HAD BEEN SET TO THE OZOG LAB IN DENVER ON MAY 16, 1983 FROM THE HORSES "NINLAN CENTRAL", "BETTER TOGETHER", "KINCORA HILL", AND "DOONSEY LUCK". ALL OF THESE TESTS HAD ORIGINALLY COME BACK POSITIVE FOR PROCAINE FROM LABORATORY SPECIALISTS, INC. THE PACKAGING AND SEALING OF ALL FOUR SPLITS WAS WITNESSED BY SGT. ERIC DUREL, STATE TROOPER ERROL DEDOTO, DR. DOUGLAS, THE RESPECTIVE TRAINERS, AND MYSELF. THE SPLITS WERE PACKAGED AND DELIVERED TOGETHER DURING A SPRING BLIZZARD THAT HAD CAUSED A POWER OUTAGE. BECAUSE OF THE POWER OUTAGE, THE SPLITS WERE UNABLE TO BE KEPT FROZEN, AND WERE SLIGHTLY ALKALINE, WHICH CAN CAUSE PROCAINE TO DECOMPOSE. THREE OF THESE SPLITS PROVED NEGATIVE FOR PROCAINE DUE TO THE DECOMPOSITION OF THE SPLITS, ONE PROVED POSITIVE FOR PROCAINE.
6/15/83 TRAINER LINDA OWENS AND HER HUSBAND RALPH OWENS APPEARED BEFORE THE STEWARDS CONCERNING HER SPLIT SAMPLE ON THE HORSE "DOONSEY LUCK". HER SPLIT PROVED NEGATIVE FOR PROCAINE. AFTER VIEWING THE EVIDENCE ON HAND, THE STEWARDS SUSPENDED HER LICENSE FOR THIRTY (30) CALENDAR DAYS AND DISQUALIFY "DOONSEY LUCK" FROM 1st PLACE AND PLACED HIM LAST. RULING NO. 168 WAS THEN ISSUED."
ABSOLUTE INSURER RULE
When a report is received from the State chemist reflecting that his chemical analysis is positive for the presence of a prohibited medication, this is to be taken as prima facie evidence that the medication has been administered to the horse, and that the owner, and/or trainer, and/or groom is negligent in handling the horse. LAC 11:6:53.15. Those persons, however shall be permitted to interpose reasonable defenses. LAC 11:6:53.16. However, the trainer is made the absolute insurer of the condition of those horses he enters regardless of the acts of third parties. LAC 11:6:53.18[2] Owens argues that these provisions *767 are violative of due process, and are unconstitutional. We disagree.
Our brethren of the Third Circuit addressed this issue in Briley v. Louisiana State Racing Commission, 410 So.2d 802 (La.App. 3rd Cir.1982) writ den. 414 So.2d 375 (La.1982) and their analysis is most appropriate to this case.
"... the provision (trainers are absolute insurers) has a rational basis and is reasonably related to the governmental interest sought to be advanced by it. Even if one argues that a separate classification exists (trainers rather than someone else being absolutely liable) `the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment.' (citations omitted) The governmental interest is to insure honest and safe races as well as to protect the integrity of the industry and its source of revenues generated from the activity. The burden being placed on the trainers, who have control of the horses before and after the race, is not so onerous as to be unconstitutional. When one weighs the control of the trainer, his grooms and jockey and their ability to prevent tampering with the horse, with the safety and integrity of the industry and public fisc, no one is in a better position to bear the obligation than the trainer. A substantial governmental purpose is served. To merely disqualify the horse and not penalize the trainer would not, in all likelihood, give much impetus in preventing the drugging of horses. However harsh the rule it is applied equally to all trainers and therefore is not unconstitutional in its application." Id. at 805-806.

THE COMMISSION'S RULING
The general rule is that the reasonable discretion of administrative boards, such as the Commission, will not be disturbed absent proof of an abuse of that discretion. The Courts should not interfere with the bona fide judgment of such a board when based on substantial evidence. Cannatella v. Civil Service Commission, 381 So.3d 1278 (La.App. 4th Cir.1980), writs refused 384 So.2d 793 (La.1980). Horse racing is a sport which is the subject of extensive and detailed legislation, and the conduct of that sport has been entrusted to the Commission. Romero v. Stephens, 359 So.2d 1061 (La.App. 3rd Cir.1978), writs den. 360 So.2d 1177 (La.1978). The decision of the Commission cannot be considered arbitrary unless it was made without reasons or reference to relevant considerations. Cannatella, supra.
After a review of the record we find the Commission's decision amply supported by the evidence, and do not find it to be an arbitrary abuse of discretion.
The facts clearly show that the analysis of the State Chemist was positive for procaine. The referee sample was "conditionally" negative. That is, the test result was qualified by the laboratory because of the inability to keep the specimen frozen. The third test run by the same referee chemist, but using the remainder of the test sample, was positive.
Under these circumstances we will not invade the province of the Commission and therefore affirm the judgment below.
AFFIRMED.
NOTES
[1] LAC 11-6:53.37.1 provides:

"The following procedure is hereby established for the testing of a split or referee sample.
After a horse has voided and its urine collected for testing, the volume of urine collected shall be split or divided into approximately equal parts, one being processed for initial laboratory testing for the detection of the presence of prohibited drugs or substance therein. The remaining part shall be identified as the split or referee sample to be processed for future testing under the procedures hereby established. Both parts shall be treated with a proper amount of ascorbic acid to preserve the sample against deterioration of the sample ingredients.
Should blood be drawn at the test or retaining barn for testing, it shall be split or divided in approximately equal parts to be processed for testing by the initial test and the split is referee test if timely requested. If the blood is from a two year old horse, the specimen tag shall so indicate.
The veterinarian in charge of the test barn shall indicate on the specimen or sample tag sent to the chemical testing laboratory along with any sample the fact that the specimen was taken from a two year old horse.
Within five days from the date the stewards notify a trainer that the initial laboratory test on a urine or blood specimen from a horse entered and raced by him was positive for the presence of a prohibited drug or substance, the trainer must request the stewards to have the split or referee sample tested by an alternate laboratory as provided herein. At the time of his request the trainer must deposit the sum of $300 with the stewards to cover all expenses to be incurred in testing the split or referee sample. The stewards shall forward the $300 deposit to the state chemical testing laboratory. Failure of a trainer to make a timely request to the steward constitutes a waiver of any and all rights to have the split or referee sample tested.
A trainer timely requesting a testing of a split or referee sample may select any one of the laboratories, classified and designated as alternate laboratories, to perform the testing."
[2] "The trainer and/or assistant trainer shall be responsible for and be the absolute insurer of the condition of the horses he enters regardless of acts of third parties. Trainers and/or assistant trainers are presumed to know the rules of the Commission."