Charles C. ROUSH, Appellant (Plaintiff),

v.

The PARI–MUTUEL COMMISSION OF the STATE OF WYOMING and its Commissioners, Agents and Servants, Alice Beasley, Virginia Merritt, Bev Pridgeon, Ken Griggs, and James Purdy, Appellees (Defendants).

No. 95–133.

Supreme Court of Wyoming.

May 29, 1996.

**1134**

Franklin D. Bayless of Bayless, Slater & Macy, P.C., Cheyenne, Paul Thomas Glause, Rock Springs, for appellant.

William U. Hill, Attorney General; Barbara L. Boyer, Senior Assistant Attorney General; and Dennis Coll, Senior Assistant Attorney General, Cheyenne, for appellees.

Before GOLDEN, C.J., THOMAS and LEHMAN, JJ., and GUTHRIE and STEBNER, District Judges.

THOMAS, Justice.

The issues in this case are the progeny of the absolute insurer rule found in the rules of the Wyoming Pari–Mutuel Commission (Commission). Charles C. Roush (Roush) was fined by the Commission, the winner's purse was forfeited, and his racing license was suspended because a horse he raced tested positive for an illegal drug, methylphenidate. The primary issue is whether the absolute insurer rule can be invoked by the Commission because of a failure to establish a proper foundation for the introduction of the result of a drug test that triggered the rule. In addition, Roush contends the Commission erred in its decision because he successfully rebutted the presumption of negligence upon which the application of the absolute insurer rule rests, and his right to due process of law was violated because of delay in the Commission proceedings and the failure to follow proper administrative law procedures. A collateral error is asserted because of the dismissal by the district court of a civil rights claim pursuant to 42 U.S.C. § 1983 (1988), which Roush sought to join with his petition for review. We hold the Commission correctly invoked the absolute insurer rule, and there were no prejudicial errors, relating to due process or otherwise, in these proceedings. The Order Affirming Agency Order Suspending License of Charles C. Roush entered in the district court is affirmed.

In the Brief of Appellant, Roush states these issues:

I. Whether Wyoming Pari–Mutuel Commission's decision should be reversed pursuant to W.S. § 16–3–114 for the reason that the absolute insurer rule is inapplicable absent a sufficient chain of evidence?

II. Whether Wyoming Pari–Mutuel Commission's decision should be reversed pursuant to W.S. § 16–3–114 for the rea-

son that the absolute insurer rule is inapplicable for the reason that appellant licensee was not negligent in the care of his horse Bulls Eye Special.

III. Whether Wyoming Pari–Mutuel Commission's decision should be reversed pursuant to W.S. § 16–3–114 for the reason that the conduct of the hearings by the Wyoming PariMutuel Commission was not in accordance with the law, without observation or procedure as required by law, and conducted in such a manner as to be arbitrary, capricious and an abuse of discretion and contrary to constitutional right, power and privilege.

IV. Whether the May 5, 1995 order of the Laramie County District Court upholding the administrative decision and dismissing the 42 U.S.C.1983 complaint filed by appellant Roush was contrary to law and constitutional right, power and privilege.

In the Brief of Appellees, the Commission offers no statement of the issues but, instead, styles the arguments in this way:

I. Substantial evidence was presented to show that the chain of evidence was not broken and the sample containing the drug methylphenidate was taken from appellant's horse.

II. Appellant violated the absolute insurer rule because an illegal drug was found in his horse and because he failed to properly guard his horse.

III. Appellant was afforded due process during his administrative licensure hearing.

IV. The district court properly dismissed the 42 U.S.C.1983 complaint filed by appellant.

In June 1993, Roush brought a sorrel gelding named Bulls Eye Special to the Sweetwater Downs racing meet at Rock Springs. Roush was the trainer for Bulls Eye Special and, on June 27, 1993, the horse ran in, and won, the seventh race at Sweetwater Downs. After the race, Bulls Eye Special tried to jump the inside rail at the track. The horse sustained cuts on its back legs and a major laceration on the rib area of its right shoulder, underneath the front leg. Roush requested Bulls Eye Special be taken to its own stall for drug testing rather than to the test barn because of these injuries, and Dr. Michael H. Ruby (Ruby), veterinarian for the Commission, agreed to this change from the usual procedure. Ruby observed Bulls Eye Special was beginning to stiffen because of his injuries and thought it would be best if the horse did not have to walk to its stall after the testing.

Sherry Robison (Robison), veterinarian assistant to Ruby, was in charge of collecting the urine sample for drug testing on Bulls Eye Special. When she learned the horse had been taken to its own stall, she took the pole and cup used to collect the urine sample, but decided not to take the rest of the testing kit, including the urine bag and test card, because she was concerned the horse would urinate before she could reach its stall. When she arrived, Roush directed her to Bulls Eye Special's stall. She observed that the horse was "bleeding out the front end on his chest."

Ruby came to the stall, examined Bulls Eye Special, and returned to the test barn to get the rest of the testing kit. At the test barn, he recognized the urine bag for the eighth race already was prepared, but there was no urine bag for the seventh race. He then checked the sequence numbers for the fifth and sixth races and realized that Marty Lloyd (Lloyd), another assistant, had filled out the next numbered test card, J21769, with information for the eighth race. Lloyd had done so because he believed Robison had filled out the information for the seventh race and had taken the bag and test card with her. Ruby showed the error to Lloyd, explaining Robison had not filled out the card for the seventh race. Ruby directed Lloyd to change the card, and Lloyd, agreeing there had been a mistake, crossed out the information pertaining to the eighth race, and then wrote "Bulls Eye Speicle [Special], sor [sorrel], G [gelding], 4[age] and 6101K [tattoo number]" on the card while Ruby watched him.

Ruby took the card Lloyd had altered, numbered J21769, a urine bag, blood tube, and a syringe and needle, and joined Robison at Bulls Eye Special's stall. Ruby gave the

card to Robison. He went into the stall, verified the horse's tattoo number as 6101K, the same number as on the record the racing secretary had provided him, took a blood sample, and placed the sample in the collection tube. Ruby returned to the test barn where he labeled the blood tube, sealed it, and placed it in the refrigerator with other blood samples. Later, after everyone else had left the barn to prepare for the ninth race, Robison successfully collected a urine sample from Bulls Eye Special. She put the sample in the urine bag, checked the label against the test card, and noticed the test card Ruby had given her had been altered. Roush returned to the barn and signed the test card without comment. Robison returned to the test barn, sealed the urine bag, put it in another bag, tore off the end of the test card, making certain all the information matched, sealed the bag, and put it in the freezer. She testified she was the only person to handle the urine bag.

The only people who had access to the refrigerator were Ruby and the two assistants. For security, Ruby ran a chain through the lock through the door on the refrigerator, locked the refrigerator, and also locked the test barn at night. He testified it was impossible for the samples to be switched.

After the weekend of racing, Ruby sent all samples, including those from Bulls Eye Special, to Industrial Laboratories Company in Denver. The product of the testing at Industrial Laboratories Company was that methylphenidate was found in the urine sample J21769 collected from Bulls Eye Special. Industrial Laboratories Company prepared an affidavit informing the executive director of the Commission of that fact on July 2, 1993.

On the same day, Roush was served with a copy of the Commission's Notice of Violation and Formal Hearing, and the hearing was set for July 9, 1993. Roush filed a motion to continue to allow "additional time to investigate this matter, conduct discovery, subpoena witnesses and prepare for the hearing." The Commission granted the motion and reset the hearing for July 24, 1993. On that day, Roush objected to a hearing before stewards who were not present at the Sweet-

water Downs race involving Bulls Eye Special, but did agree that the matter could be transferred to the Commission without a stewards' decision. A new notice of hearing, then, was given to Roush setting the hearing for August 11, 1993. He was informed he had "the right to have counsel present, the right to present a defense, including witnesses for that purpose, and the right to cross-examine the Commission's witnesses." Later, the Commission granted Roush's second motion to continue, and it set the matter for hearing on August 31, 1993. A third motion for continuance filed by Roush was denied.

The hearing was commenced on August 31, 1993, and two witnesses testified for the Commission. Roush cross-examined each witness and, since the proceeding took longer than expected, it was continued to October 7, 1993. When the hearing resumed, Roush was permitted additional cross-examination of the Commission's witnesses, and he also presented evidence through four witnesses, including himself and an expert witness. Following that hearing, the Commission orally announced a tentative decision to suspend Roush's racing license for one year, fine him $3,500, and require the purse to be forfeited, all contingent upon the results of DNA testing.

After the final written DNA test results were received on January 24, 1994, the Commission set an additional hearing for March 24, 1994 at which it decided not to receive additional evidence. The Commission's Findings of Fact, Conclusions of Law and Final Order was filed on May 4, 1994, ruling Bulls Eye Special was drugged with the illegal drug, methylphenidate; the chain of custody of the urine sample had been established; Roush was the horse's trainer; Roush had breached the absolute insurer rule by allowing a horse under his supervision and control to run a race with an illegal drug in its system; and Roush did not provide substantial evidence to rebut the presumption that he was responsible for the condition of the horse. The Commission suspended his license, imposed the fine, and required forfeiture of the purse.

Roush sought judicial review of the Commission's decision in the district court and sought to join an action for violation of 42 U.S.C. § 1983 with the judicial review in accordance with WYO. R. APP. P. 12.12. The district court dismissed the complaint asserting violation of 42 U.S.C. § 1983 and affirmed the Commission's Findings of Fact, Conclusions of Law and Final Order. Roush appeals the decision of the district court.

Judicial review of a final decision of an administrative agency is accomplished pursuant to WYO. STAT. § 16–3–114 (1990). In *Devous v. Wyoming State Bd. of Medical Examiners*, 845 P.2d 408, 414 (Wyo.1993), we spoke to the precept relating to substantial evidence in review of agency actions:

As those standards of review have been discussed in our cases, one precept which has evolved is that agency action will be set aside if it is not supported by substantial evidence. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the conclusions of the agency. The entire record is to be examined to determine if there is substantial evidence to support the agency's findings. The reviewing court does not substitute its judgment for that of the agency with respect to findings of fact if they are supported by substantial evidence. When the case comes before the supreme court, the findings of the agency are reviewed without according any special deference to the decision of the district court. The burden is assigned to the party challenging the sufficiency of the evidence to demonstrate that the Board's decision is not supported by substantial evidence. (Citations omitted.)

In this case, our review of the sufficiency of the evidence must be related to the absolute insurer rule. The absolute insurer rule is set forth in the WYOMING PARI-MUTUEL COMMISSION RULES OF RACING AND PARI-MUTUEL EVENTS (May 1992), which state:

### CHAPTER VII

### LICENSING / LICENSEES

\* \* \* \* \* \*

SECTION 10. *Trainers / Assistant Trainers*

\* \* \* \* \* \*

(h) A trainer shall be responsible for the condition of a horse trained by him, and shall be the **absolute insurer of that horse's condition during a race, subject to rebuttal of the presumption.**

### CHAPTER VIII

### CONDUCT OF RACES

\* \* \* \* \* \*

SECTION 2. *Medication Procedures for Horse Races*

(a) No horse participating in a race shall carry in its body any foreign substance except as provided in these Rules.

(b) A **finding** by the chemist that **a foreign substance is present in the test sample shall be prima facie evidence** that such foreign substance was administered and carried in the body of the horse while participating in a race. Such a **finding** shall also be taken as **prima facie evidence that the trainer and his agents responsible for the care or custody of the horse have been negligent in the handling or care of the horse.** The **presumption of negligence may** be **rebutted by competent evidence**, otherwise the absolute insurer rule for trainers will be deemed to have been violated. (Emphasis added.)

▮ The purpose and thrust of an absolute insurer rule like that in Wyoming was aptly captured by the Michigan Court of Appeals in *Berry v. Michigan Racing Comm'r*, 116 Mich.App. 164, 321 N.W.2d 880, 884 (1982), where the court was responding to a due process challenge:

The insurer rule provides maximum protection against illegal drugging; arguably it is the only practical means of reducing such corrupt practices. *Morris v. The West Virginia Racing Comm.*, 133 W.Va. 179, 55 S.E.2d 263 (1949). If, as plaintiff proposes, we were to conclude that due process necessitates a finding of guilty knowledge or intent prior to the imposition of sanctions, enforcement of the prohibi-

tion on horse drugging would be virtually impossible, and the interests of the public and state would go unprotected. The insurer rule is a reasonable alternative to either leaving those interests unprotected or forbidding legalized racing.

This reasoning was followed by the Louisiana Court of Appeals in *Arrington v. Louisiana State Racing Comm'n*, 482 So.2d 200, 201 (La.Ct.App.1986):

> The absolute insurer rule which makes the trainer responsible for the condition of his horses does not violate Due Process because the rule is reasonably related to the government interests sought to be advanced by the rule—to insure fair, safe races, to protect the wagering public and to preserve the public's confidence and integrity of the racing industry. *See* La.R.S. 4:141; *Louisiana Rules of Racing*, Preface and Forward (1983).
>
> We agree with *Owens [v. Louisiana State Racing Comm'n*, 466 So.2d 764 (La. Ct.App.1985)]; the strong public interest justifies close regulation of horse racing, an industry especially susceptible to fraud and corruption. Furthermore, strict regulation of the trainer by making him an absolute insurer is reasonable because the trainer is the person best able to guarantee the condition of the horses. See *Berry v. Michigan Racing Commissioner*, 116 Mich.App. 164, 321 N.W.2d 880 (1982), appeal dismissed, 469 U.S. 806, 105 S.Ct. 64, 83 L.Ed.2d 15 (1984). "The insurer rule provides maximum protection against illegal drugging; arguably it is the only practical means of reducing such corrupt practices.... The insurer rule is a reasonable alternative to either leaving [the public and State] interests unprotected or forbidding legalized racing." (citations omitted) *Id.,* 321 N.W.2d at 884.

Without attacking the absolute insurer rule, as adopted by the Commission, Roush asserts it is not properly invoked in this case because the urine sample containing the methylphenidate was not properly collected, labeled, and preserved, thus, breaking the chain of custody. The thrust of his contention is that the evidence was not sufficient to demonstrate the sample came from Bulls

Eye Special. He argues Ruby, Robison, and Lloyd did not follow the procedural rules for collecting samples from winning horses, which is essential to establishing the appropriate chain of custody. He suggests the altered test card is sufficient to demonstrate the break in the chain of custody, and he speculates someone tampered with Bulls Eye Special after the race because the Commission failed to keep the horse under constant surveillance until the samples were taken. The focus of his argument is that, lacking a properly identified test result, the finding, which supports the invocation of the absolute insurer rule, is improper.

■ It is essential to the invocation of the absolute insurer rule that the evidence establish the test sample containing the foreign substance came from the particular horse. In *Segura v. Louisiana State Racing Comm'n*, 577 So.2d 1031, 1033 (La.Ct.App. 1991), the court said, in discussing the chain of custody in drug testing of race horses:

> Before test results ... can be admitted in a civil or criminal proceeding, the party seeking to introduce the results must lay a proper foundation by **"connecting the specimen with its source, showing that it was properly labeled** and preserved, properly transported for analysis, and properly taken by an authorized person, properly tested."
>
> \* \* \* \* \* \*
>
> **The chain of custody rule is intended "to preserve the integrity of the evidence, i.e., to prevent [it] from being tampered with or ... lost."** This Court has determined that, in a civil case, twenty-four hour vigilance of the evidence is not required. What is essential is preserving the integrity of the evidence and protecting it from tampering and loss. These factors must be established by a preponderance of the evidence. (Citations omitted, emphasis added.)

*Segura* is remarkably similar to this case, and the court concluded there was no break in the chain of custody of the urine specimen. The court also held that the absolute insurer rule, which makes the trainer responsible for the condition of horses he enters in races

regardless of actions of third parties, did not violate due process.

In a criminal case, we explained the significance of the chain of custody to authentication or identification as follows:

> In drug cases like this one, the physical evidence often has no distinctive characteristics so the circumstances, or more specifically the chain of custody, must be established. But the
>
> > "proponent need not maintain physical objects * * * under round-the-clock watch, and need not call as authenticating witnesses each person who handled the object from the time of its recovery to the time of trial, **so long as enough testimony is presented to permit a reasonable inference that the object offered is what the proponent claims it to be.**"
>
> **If the opponent seeks exclusion based on alteration of the evidence, he must support that charge with more than speculation.**

*Robinson v. State,* 716 P.2d 364, 369 (Wyo. 1986) (citations omitted, emphasis added).

■ We also have held that, in applying WYO. R. APP. P. 401, 402, and 403, rulings on the admission of evidence and determinations with respect to adequacy of foundation are within the sound discretion of the trial court. *Furman v. Rural Elec. Co.,* 869 P.2d 136 (Wyo.1994); *Contreras by and through Contreras v. Carbon County Sch. Dist. 1,* 843 P.2d 589 (Wyo.1992); *L.U. Sheep Co. v. Bd. of County Comm'rs of Hot Springs County,* 790 P.2d 663 (Wyo.1990); *Horton v. State,* 764 P.2d 674 (Wyo.1988). The WYOMING RULES OF EVIDENCE generally are invoked in contested case proceedings before administrative agencies, and the exercise of discretion in that setting must be afforded to the agency as the trier of fact. We set aside such a determination only for an abuse of discretion.

■ In this instance, we have no difficulty sustaining the exercise of agency discretion. Robison collected urine samples from a horse bleeding from a wound in the front of its chest. Bulls Eye Special had sustained such a wound immediately following the race.

Ruby collected a blood sample from that horse, and he verified the identity of the tattoo on the horse with the tattoo number on the race test card. Ruby explained how the card was altered because it had been inappropriately prepared for the eighth race, and he explained this was the standard practice to preserve the sequence on the test cards in any instance in which an error was made in initial preparation of the card. The record demonstrates the urine specimen was correctly labeled and related to Bulls Eye Special so the chain of that evidence was appropriately established. The sample tested by the laboratory was taken from Bulls Eye Special, and the claim it belonged to another horse is simply unfounded.

While Roush complains about a departure from standard procedures, he requested the taking of the samples at Bulls Eye Special's barn, rather than at the test barn. That adjustment in procedure had nothing to do with the chain of custody of the urine sample and nothing in the record demonstrates any change in the procedure resulted in the specimen being tampered with, lost, or taken from the wrong horse. The urine sample was linked by the evidence to Bulls Eye Special. We conclude there was no abuse of discretion in the Commission's ruling that the chain of custody of the urine sample was adequately established.

The claim that Bulls Eye Special was tampered with following the race also has no validity. Roush argues that the responsibility devolved upon the Commission, not upon him, to protect Bulls Eye Special from tampering during the period after the race. No evidence supports such a claim, and it is nothing more than speculation.

In a separate claim of error, Roush contends he was not negligent in the care of his horse. He argues he took normal and typical precautions to protect his horses by raking a pattern in the dirt in front of their stalls so tracks of anyone entering the area might be detected. He explained he moved the feed buckets and rain barrels to the back of the stalls to prevent easy access to them. He argues that, because the rules do not require a trainer to guard his horse, he is relieved from responsibility to insure the condition of

his horse at all times. It follows, Roush argues, that the decision to suspend his racing license was an abuse of discretion, not in accordance with law, contrary to constitutional right, power, and privilege, and must be reversed because the absolute insurer rule is inapplicable.

■ It is true that, under the rules, the presumption of negligence flowing from a finding by a chemist that foreign substance is present in the test sample is rebuttable. WYOMING PARI-MUTUEL COMMISSION RULES OF RACING AND PARI-MUTUEL EVENTS VII § 10(h). If the presumption is not rebutted, the absolute insurer rule for trainers is deemed to have been violated. In *Hall v. Louisiana State Racing Comm'n,* 505 So.2d 744, 746–47 (La.Ct.App.1987), the court described the effect of the presumption of violation of the absolute insurer rule on the burden of proof:

> When a report is received from the State chemist reflecting his expert opinion that the chemical analysis indicates the presence of a forbidden narcotic or stimulant, this is taken as prima facie evidence that such has been administered to the horse in question. The burden then shifts to the trainer to rebut that presumption. Failure to do so results in "absolute" liability on the trainer's part. (Citations omitted.)

"A finding * * * a foreign substance is present in the test sample * * * shall also be taken as prima facie evidence that the trainer and his agents responsible for the care or custody of the horse have been negligent in the handling or care of the horse." WYOMING PARIMUTUEL COMMISSION RULES OF RACING AND PARI-MUTUEL EVENTS VIII § 2(b). In addressing this issue, the Ohio Court of Appeals held that the absolute insurer rule imposes strict liability on the trainer and "imposes liability, without fault, upon a trainer of record who enters into a race a horse which has been administered any chemical or drug." *Sahely v. Ohio State Racing Comm'n,* 1993 WL 112505, at *2 (Ohio.Ct. App. Apr. 6, 1993).

■ This is the thrust of the absolute insurer rule in Wyoming, which does, indeed, impose liability without fault unless the train-er rebuts the presumption of negligence by competent evidence. The specimen taken from Bulls Eye Special and the test result demonstrating the presence of methylphenidate constituted *prima facie* evidence of violation of the rules. The burden of proof then shifted to Roush to rebut the presumption of negligence.

■ The evidence failed to rebut the presumption set forth in the absolute insurer rule. Roush left Bulls Eye Special unattended for about ten hours during the night of June 26 and the early morning of June 27, 1993. Roush had no additional help at the track, and any third party who wanted to tamper with Roush's horse was afforded ample opportunity. The precautions Roush claims to have employed were not adequate to prevent tampering. Furthermore, Roush points to nothing in the record that would demonstrate third-party intervention with Bulls Eye Special. The absolute insurer rule was not rebutted and, in any event, the rules provide that the trainer is "the absolute insurer of and responsible for the condition of [his/her] horses entered in a race, regardless of the acts of third parties." WYOMING PARI-MUTUEL COMMISSION RULES OF RACING AND PARI-MUTUEL EVENTS II § 2(q). Roush had the duty to properly protect his horses from tampering.

■ The articulation of that proposition in the rules is supported by another decision of the Louisiana Court of Appeals in which the court said, "[t]he trainer is responsible and the absolute insurer of his horse's condition regardless of acts of third parties." *Olbrych v. Louisiana State Racing Comm'n,* 451 So.2d 1253, 1257 (La.Ct.App.1984). The Commission did not abuse its discretion; acted in accordance with law; did not act contrary to any constitutional right, power, and privilege; and is entitled to have its decision sustained. We hold the Commission correctly invoked the absolute insurer rule. The decision to suspend Roush's license, fine him, and forfeit the purse was supported by substantial evidence.

Roush's next argument is that his racing license represents a constitutionally protected property right. He asserts he has a

liberty interest in his right to employment, which translates into a right to earn a living and enjoy a good reputation, and this right cannot be undermined by unreasonable, unfair governmental action. The Fourteenth Amendment to the Constitution of the United States protects citizens from arbitrary state action proclaiming, "nor shall any State deprive any person of life, liberty, or property, without due process of law." [1] We have summarized the constitutional principles relating to licensure in Wyoming in *Devous,* 845 P.2d at 415 (quoting *Gilchrist v. Bierring,* 234 Iowa 899, 14 N.W.2d 724, 732 (1944) (emphasis added)):

> The cases, from which we have quoted, clearly announce fundamental principles, essential to the life of a free people living under a republican form of government. **The right to earn a living is among the greatest of human rights and, when lawfully pursued, cannot be denied. It is the common right of every citizen to engage in any honest employment he may choose, subject only to such reasonable regulations as are necessary for the public good.** Due process of law is satisfied only by such safeguards as will adequately protect these fundamental, constitutional rights of the citizen. **Where the state confers a license to engage in a profession, trade, or occupation, not inherently inimical to the public welfare, such license becomes a valuable personal right which cannot be denied or abridged in any manner except after due notice and a fair and impartial hearing before an unbiased tribunal.** Were this not so, no one would be safe from oppression wherever power may be lodged, one might be easily deprived of important rights with no opportunity to defend against wrongful accusations. This would subvert the most precious rights of the citizen.

Roush specifically relies upon the provisions of Wyo. Stat. § 16–3–113 (1990):

> (a) When the grant, denial, suspension or renewal of a license is required by law to be preceded by notice and an opportunity for hearing the provisions of this act concerning contested cases apply.

> \* \* \* \* \* \*

> (c) No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license.

He asserts unreasonable delay in this proceeding because the Commission made its decision based on the October 7, 1993 evidence, but did not issue its final and formal decision until May 4, 1994. He also contends the Commission violated the rules requiring a fair hearing before an unbiased, fair, and impartial tribunal when it decided to suspend Roush on August 31, 1993 based solely on the State's evidence; refused to allow the inconclusive test results into evidence; and denied his motion to dismiss as required by its own order because results of the DNA test were inconclusive. Roush points to the dates of suspension, originally set for January 1, 1994 to December 31, 1994 and then extended to May 2, 1994 to May 1, 1995, because of the delay in entering the final decision. He argues that this hampered him in maintaining clientele in 1994 and 1995, causing him to lose business and incur considerable expense.[2]

Roush appears oblivious to the inconsistency between his contentions relating to delay and his other assertions. Roush requested three continuances, and the Commission granted two of them. Roush agreed with the decisions of the Commission on August 31 and October 7 to continue the matter until a

---

1. While not relied upon by Roush, Article 1, Section 6, of the Constitution of the State of Wyoming provides, "[n]o person shall be deprived of life, liberty or property without due process of law."

2. While Roush complains of the district court's imposition of a $10,000 bond to stay the suspension of his license and the Commission's refusal to issue a new license to Roush because of his failure to pay his $3,500 fine, he does not argue the issues or present cogent argument so we will not address those statements.

later date. On October 7, with respect to continuance, the hearing officer advised the parties that DNA testing was a time-consuming procedure. Roush's requests for, and agreements to, continuances delayed the final decision in this case and preclude him from contending the delay prejudiced his right to due process.

In complaining of the absence of a fair hearing, Roush asserts he was suspended on August 31, 1993 solely on the State's evidence because, when the Commission announced its decision on October 7, 1993, a commissioner said:

> In the matter pertaining to Chuck Roush and Bull's Eye Special, the Commission feels that there is sufficient cause to charge the Industrial Labs of Denver to oversee a DNA test on the urine of the horse Bull's Eye Special test samples taken June 27, 1993.
>
> If a positive match occurs, resulting in a positive identification of the horse, then the Commission will enforce the absolute insurer rule, **which results in our decision of August the 31st, 1993.** (Emphasis added.)

We described the characteristics of a fair hearing in *Fallon v. Wyoming State Bd. of Medical Examiners,* 441 P.2d 322, 327, *reh'g denied,* 443 P.2d 135 (Wyo.1968) (emphasis added):

> With respect to a fair hearing, it is fundamental that **principles of justice and fair play require "an orderly proceeding appropriate to the case or adapted to its nature,** just to the parties affected, and adapted to the ends to be attained, one in which a person has an opportunity to be heard, and to defend, enforce, and protect his rights before a competent and impartial tribunal legally constituted to determine the right involved; representation by counsel; [and] procedure at the hearing consistent with the essentials of a fair trial according to established rules which do not violate fundamental rights."

Beyond the comment quoted by Roush, the record does not support a determination that the Commission decided to suspend Roush on August 31, 1993 prior to his presentation of evidence. The State recommended summary suspension to protect the public welfare at the end of that proceeding, but withdrew its recommendation, and the proceeding was continued until October. Roush was permitted to present testimony from four witnesses, including his own and that of an expert, and to present exhibits at the proceeding on October 7, 1993. He was not foreclosed in any way from presenting evidence. The Commission did not announce its decision until the end of the proceeding, and the statement of a commissioner that the Commission would enforce the absolute insurer rule, "which results in our decision of August the 31st, 1993," was simply his language taken out of context.

Roush misinterprets the statement of the commissioner regarding the DNA test results. He claims the Commission ruled that, if the DNA results were inconclusive, it was required to dismiss the case pursuant to his motion. Certainly, Roush hoped he would attain a dismissal if the results were inconclusive, but a more complete reading of the record does not support his claim. The hearing officer discussed the possibility of inconclusive test results, stating:

> If there's a question of the parties as to the conclusiveness of that [DNA testing], then I would suggest that we're probably going to have to refer them back to the Commission to determine whether the evidence provided is of sufficient nature to allow the Commission to render a final ruling.

The Commission did not state it would dismiss the charges if the DNA result was inconclusive, and there was no violation of any oral order.

Roush also argues the evidence should not have been closed after ordering the DNA testing without placing the results of that testing into evidence. "In contested cases irrelevant, immaterial or unduly repetitious evidence shall be excluded." WYO. STAT. § 16–3–108 (1990). WYO. R. EVID. 402 also provides that irrelevant evidence is not admissible. The inconclusive DNA testing was irrelevant and, therefore, inadmissible. It had no tendency to make the existence of the fact more probable or less probable that the

urine sample testing positive for methylphenidate came from Bulls Eye Special. Roush does not state what harm or prejudice he suffered by the DNA evidence not being admitted.

The record supports a conclusion that the stated reasons from the Commission for ordering the DNA test, "to give Mr. Roush benefit of the doubt completely" and "[w]e were going to, shall I say, extreme measures to be fair," are *bona fide*. Roush was given the benefit of the doubt, and the fact that the DNA testing was inconclusive does not assist him in supporting his burden of proof that he was not negligent. The record discloses the Commission conducted a series of orderly proceedings · appropriately adapted to this case which met the principles of justice and fair play. Roush received a fair hearing by an unbiased, fair, and impartial tribunal.

The final constitutional infringement asserted by Roush is the violation of procedural due process. In Wyo. Stat. § 16–3–107 (1990), provision is made for the necessary procedures and rights in contested case hearings including notice of hearing, opportunity for depositions and discovery, subpoena authority, opportunity for parties to respond and present evidence and argument, appear with counsel, a record of the hearing, and findings of fact based on the evidence. Roush first complains that, since the rules require an informal hearing before the stewards of Sweetwater Downs presiding at the race at which the alleged violation occurred, he was deprived of that right. We need not decide whether there is a requirement for an informal hearing because Roush had objected to a hearing before the stewards from Evanston who were not present at the June 27 race at Sweetwater Downs. He did not, however, object to the recommendation by the stewards that the case be referred to the Commission. When counsel for Roush was asked, "Is that [referring this case to the Commission] going to be agreeable with you, Chuck and Tom?" Counsel replied, "We respect your decision on that." Counsel continued to discuss the arrangements with the presiding stewards for that hearing to be scheduled with the Commission. These circumstances disclose waiver by Roush of his

right to object during the stewards' hearing to not holding an informal hearing, and he cannot now complain of prejudice.

Roush also complains that the rules of procedure and evidence were violated by the Commission when it ordered the DNA testing after the cut off of discovery. Roush failed to object to the DNA testing. He explained Bulls Eye Special was located in Montana and said the horse would be "available [for a subsequent sample] at any time." Again, there was a waiver of any right to claim error by failing to object to the testing at the October 7 hearing. Furthermore, Roush failed to demonstrate any prejudice. The Commission articulated a decision to fine and suspend Roush's license contingent upon results of DNA testing. Roush had everything to gain and nothing to lose by this testing. The Commission assumed a burden of proof properly assigned to Roush; assumed the expense of DNA testing; and gave him a second chance to overcome the presumption and reverse the decision.

■ Roush also contends the Commission violated its own rules when no findings of fact or conclusions of law were submitted after the October 7, 1993 hearing. An order which is not intended to dispose of a matter finally, but only to obtain additional information so that it could be considered by a lower tribunal, is not a final order. *Pub. Serv. Comm'n v. Lower Valley Power & Light, Inc.*, 608 P.2d 660 (Wyo.1980). In some respects, this case is analogous to *Jackson v. State*, 547 P.2d 1203 (Wyo.1976), where reference was made to a "final judgment," which really referred to oral remarks and conclusions of the judge from the bench. We held such utterances did not constitute "entry of a judgment or final order" for purposes of any notice of appeal.

The oral statements did not constitute a final order of the Commission, and the contingent language incorporating the word "if" precluded the comments from being a final order. Finality was contingent upon completion of DNA testing. Certainly, Roush did not seek review at that time, suggesting he did not regard the comments as a final order. The Commission properly included its Findings of Fact and Conclusions of Law in the

final order of May 4, 1994, and it did not violate any rules of law by not entering them on October 7, 1993.

 We hold Roush was afforded notice and an opportunity to be heard in a licensure proceeding. Each hearing held in this case followed a notice and an opportunity for depositions and discovery; witnesses could have been and were subpoenaed; Roush could and did respond to and cross-examine the State witnesses; he could and did present evidence and argument. He was entitled to appear with counsel and to have a record of the hearing and findings of fact based on the evidence. While there was a delay after the test revealing methylphenidate in Bulls Eye Special's urine, and the period of time is far longer than what would be preferred, the principles of justice and fair play requiring an orderly proceeding appropriate to this case and adapted to its nature were evidenced in the record. We hold the Commission did not violate Roush's right to due process relating to his property right in his racing license or his liberty interest in earning a living.

Roush's final contention is that he endeavored to join the administrative review with a cause of action for violation of 42 U.S.C. § 1983, as permitted under WYO. R. APP. P. 12.12. In contending the district court improperly dismissed that claim, Roush reasserts the identical due process argument. This provision of federal law establishes a cause of action for the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States or its laws. The conclusion we have reached above, that the Commission did not violate Roush's right to due process, completely undercuts this argument. If there was no violation of constitutional rights, then there is no cause of action under the federal statute.

In summary, we hold the Commission's finding that Roush breached the absolute insurer rule was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The record before us encompasses substantial evidence to support the Commission's finding that the chain of custody established the urine sample containing the drug methylphenidate came from

Bulls Eye Special. Roush failed to rebut the presumption incorporated in the absolute insurer rule by failing to present evidence that he was not negligent in the care and control of the horse. Roush was afforded all due process to which he was entitled under Wyoming law, federal law, and 42 U.S.C. § 1983. The Order Affirming Agency Order Suspending License of Charles C. Roush entered in the district court is affirmed in all respects.